## LEBANON STEEL FOUNDRY v. NATIONAL LABOR RELATIONS BOARD.

### No. 7990.

United States Court of Appeals for the District of Columbia.

Decided June 29, 1942.

Writ of Certiorari Denied Oct. 12, 1942.

See —— U.S. ——, 63 S.Ct. 58, 87 L.Ed. ——.

Mr. Hugh P. McFadden, of Bethlehem, Pa., for petitioner.

Mr. Ernest A. Gross, Assistant General Counsel, with whom Mr. Robert B. Watts, General Counsel, Mr. Lawrence A. Knapp, Associate General Counsel, and Mrs. Hilda D. Shea, Attorney, all of the National Labor Relations Board, all of Washington, D. C., were on the brief, for respondent.

Before GRONER, Chief Justice, and STEPHENS and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The question is narrow. Shortly, it is whether certain checkoff cards, signed by employees, constitute evidence of authority to bargain collectively.

It is stipulated the employees at petitioner's plant in Lebanon, Pa., with certain exceptions, constitute an appropriate unit. Petitioner concedes that a majority of the employees in the unit signed the cards. The company declined, and still does, to recognize the cards as conferring authority to bargain. The Board has found them sufficient, has found also that the petitioner has been guilty of unfair labor practice in refusing to bargain collectively with the designated union, S. W. O. C., and has ordered appropriate relief. We think the order must be affirmed.

The facts, in outline, follow. Petitioner, Lebanon Steel Foundry, is a Pennsylvania corporation which manufactures various types of steel castings in interstate commerce. There were between 585 and 623 employees in the unit at the crucial period. Prior to September, 1940, and thereafter, the company had a vague plan of employees' representation, known indefinitely as "the independent group" until the negotiations, during which apparently it acquired the name "The Association of Independent Lebanon Steel Foundry Workers." There is no evidence of its membership, but less than half the employees voted for employee representatives in the fall of 1940; nor is there showing that it requested recognition, attempted to negotiate a collective agreement, or did much more than deal with grievances at various times.

The Board found that the organization was dormant[1] and was not a labor organization within the meaning of the Wagner Act.

S. W. O. C. (Steel Workers Organizing Committee), affiliated with the C. I. O., is a labor organization within Section 2(5) of the Act.

In September, 1940, some of petitioner's employees secured membership application cards from an organizer for S. W. O. C. at a nearby steel plant. Seventy-three had signed these, when a meeting was held with Fritchman, S. W. O. C. district representative. Employees then stated a desire to have union dues checked off from their wages. Fritchman thereupon instructed them to use checkoff cards ("Wage Deduction Authority") in place of the membership application cards in soliciting union members. Employees who had signed the latter, with two exceptions, then signed checkoff cards and thereafter only the checkoff cards were used in soliciting members. The evidence that they were used for this purpose is undisputed.

Fritchman testified, without contradiction, that the checkoff cards were used throughout his district to signify union membership and authority to check off union dues; that the union (S. W. O. C.) customarily organizes plants in that area by having the employees sign such cards; and that all employers whose plants were thus organized accepted the checkoff cards as proof of the employee's desire to have the union represent them. The trial examiner and the Board credited this testimony.

Eventually 358 employees signed the checkoff cards. Fritchman testified they totalled 335 and 342 as of December 15, 1940, and January 10, 1941. The union's membership lists were made up from them.

On December 16, 1940, Moyer, for the union's negotiating committee,[2] submitted a proposed collective agreement to Phillips, the plant manager, told him he represented the union and a majority of the employees, and asked him to arrange a date to begin negotiations. Phillips replied the company would discuss grievances, but the contract was important, he would study it, and would advise when a meeting could be held. He said he "was not prepared to give them a date; that it might take days, might take weeks, might take months." Not satisfied, Fritchman arranged with Quinn, the company's treasurer and Phillips' superior, for a meeting of officers and the negotiating committee on December 21. At the meeting Fritchman offered to give proof that the union represented a majority. The offer was treated with indifference. Phillips indicated dissatisfaction with the contract, said the company would meet with any employee or person representing employees, but also stated "we have been dealing with an Independent Group as sole collective bargaining agency."[3] Thereafter the union representatives made repeated efforts to secure further meetings, attempted constantly, but unsuccessfully, to speed negotiations, and finally gave in to Phillips' insistence that the matter go over until after the holidays. When the holidays had passed, unsuccessful efforts were made to secure a meeting earlier than January 10, when the second one was held.

At this meeting the checkoff cards were presented, but were not counted or examined by company representatives. No question concerning majority status was raised then or previously, nor was any claim made that the "Independent Group" represented a majority. At the hearing before the trial examiner Phillips testified he did not go into the matter because he "intended to recognize and deal with the Union *and* the Independent Group as the representatives of their respective members until the definite status of each one was established."[4] (Italics supplied) However, the Board found he intended at most to permit the union to present grievances, on the evidence concerning his statements as made at the conference. The outcome of the conference was again inconclusive and unsatisfactory, with union negotiators charging that the company was "stalling."

[1] Cf. notes 2 and 5 infra.

[2] He was also chairman of the employee representation group, and Phillips assumed before they met that Moyer was acting for that group. Cf. note 5 infra.

[3] Phillips later qualified this by saying the company intended to deal with "the Independent Group" as sole collective bargaining agency "until the definite stat-us of each group was established." Cf. text at note 4 infra. At the hearing before the trial examiner he testified he used the term "sole collective bargaining agent" without proper knowledge of its implications. The examiner and the Board found this explanation and counsel's attempt to bolster it by argument in the brief unconvincing.

[4] Cf. note 3 supra.

The union men tried to expedite further meetings, offering to meet at night, on Saturdays or at any convenient time. Phillips declined to do this or to fix another date then. When Fritchman called him on January 13, as he suggested, the earliest date he would consider was January 24. Fritchman protested, pointed out the union had become restive and the previous day had adopted a resolution for "further action" if no agreement were reached by February 1, and again offered to meet at night. Other efforts, including threats to call in "a government official," were made to advance the date without success. In his discussions with Fritchman and others on the 13th Phillips insisted upon a clear distinction between grievances, concerning which the management was disposed to deal with S. W. O. C. when designated as agent by its members, and negotiations for a contract, which "required lengthy and deliberate attention." In the meantime, he said again, the company intended to recognize and deal with the "Independent Group" as sole collective bargaining agent, until the definite status of each group was established.

On January 14, after Phillips had declined again to expedite the meeting, S. W. O. C. filed a charge with the Board. On January 20, the Board's field examiner held a conference with representatives of both sides. An effort was made to settle the matter by a consent election, but failed when the "Independent Group" declined to permit its name to go on the ballot with S. W. O. C.'s,[5] and the company declined to state in writing that it would bargain in good faith with the union if it should win the election. This was on the advice of counsel that "a request to put into writing that which the law already requires them to do is unreasonable and capricious." Thereafter the company declined to continue negotiations with the union on the ground that since the Board had intervened in the case there would be no point in further negotiations.

Petitioner says the case raises only the narrow question of law whether the checkoff cards are sufficient on their face as evidence of authority to bargain collectively.

It urges the authority must be gathered "from the four corners" of the instrument, without reference to the circumstances under which they were signed, or usages prevailing in the area. It regards the cards as in effect technical powers of attorney, like powers to convey or mortgage realty, and insists, first, that their language contains nothing to indicate intention to authorize collective bargaining and, second, that recourse cannot be had to the evidence concerning usage and the conditions surrounding execution to give the words such a meaning.

On the other hand, the Board has found and contends that the cards show on their face intention to authorize collective bargaining, and this intent becomes indisputable when the cards are read in view of the proven usages and the circumstances of signature, as the Board says may be done. We think the Board is clearly right.

Two forms of checkoff card were used, as follows:

"Wage Deduction Authority

"Dated..........

"No...........

"To the Paymaster of

"I hereby authorize you to deduct from my wages one dollar ($1.00) per calendar month, beginning with the month of......, 19.... provided I have worked a total of five (5) days or more during the calendar months.

"This payment to be sent to the Secretary-Treasurer of the S. W. O. C., David J. McDonald, 1500 Commonwealth Building, Pittsburgh, Pa.

"This authority to be effective during the life of the agreement. This authority will automatically be cancelled if, as and when the labor and working agreement between your Company and the S. W. O. C. terminates.

.............. ..............

"(Signature) (Address)"

"1537 Wage Deduction Authority

"No.......... Dated..........

"To the paymaster of

"I hereby authorize you to deduct from my wages *union dues* amounting to one dollar ($1.00) per calendar month, provided

---

[5] The company consented on condition that the names of both S. W. O. C. and the independent group appear on the ballot. The latter's representatives informed the field examiner they did not wish to participate in the election. Light is thrown on this by the fact that six of the nine representatives chosen at the last election were union adherents, including Moyer. Cf. note 2 supra. The company then declined to give written assurance it would bargain with S. W. O. C., if it

I have worked a total of five (5) or more days during the calendar month; and my *initiation fee* (amount specified below) which shall be deducted within one month from the date you received this card from the Financial Secretary of the local union. (Italics supplied)

"Money so deducted to be sent to David J. McDonald, Secretary-Treasurer of the S. W. O. C., 1500 Commonwealth Building, Pittsburgh, Pennsylvania.

"This authority shall only be effective during a collective bargaining agreement between the S. W. O. C. and your Company that includes the check-off system. Initiation fee, $..........

.............. ..............

"(Signature) (Address)"

 The Wagner Act requires no specific form of authority to bargain collectively. It is not a statute of frauds or an act prescribing the formalities of conveyancing. No seal or writing is required by its terms. Nor is any special formula or form of words. Authority may be given by action as well as in words. An application for union membership implies authority to bargain. N. L. R. B. v. Louisville Refining Co., 6 Cir., 1939, 102 F.2d 678, 680, certiorari denied, 1939, 308 U.S. 568, 60 S.Ct. 81, 84 L.Ed. 477; N. L. R. B. v. Somerset Shoe Co., 1 Cir., 1940, 111 F.2d 681, 687. Likewise, with registration cards, Matter of Elbe File and Binder Co., Inc., and Bookbinders, etc., Local No 119, 2 N. L. R. B. 906, 910 (1937), notwithstanding the signers have not paid dues or initiation fees or been admitted to membership.[6] Not form, but intent, is the essential thing. The intent required is merely that the union or other organization or person act as the employees' representative in collective bargaining. This intent has been found from participating in a strike vote taken by the union,[7] a strike called by the union,[8] and acceptance of strike benefits.[9] It is only necessary that it be manifested in some manner capable of proof, whether by behavior or language. Oral authority is not invalid. It is merely, as always, more difficult to prove. Lawyers' formulae, formalities and words are not needed. The agreements or authorizations are laborers', not scriveners', expressions of intention. They are expected to be made in the workingman's manner, not in that of management as it conducts corporate affairs, with a lawyer at its side.

 For the same reason rules or principles of construction should be simple, liberal, of the commonsense variety.[10] Apart from such highly technical matters as deeds, mortgages, bonds, such things as custom, usage and the circumstances in which the parties act generally may be shown to give to written instruments the intention the parties had when they made them.[11]

Labor has its own usages, customs and practices. Other persons are not always familiar with them. Unions are no longer in the amorphous stage in which they have no traditions or mores for doing things. They now have a vocabulary or language of their own, in some instances as unintelligible to outsiders as Gaelic to a Greek.[12] The customs, practices, agreements and understandings relating to unions, membership

should win the election. Moyer testified he had never seen any bylaws or constitution for the independent group, and had never heard it called by a name until the conference on January 20.

[6] Matter of National Motor Bearing Co. and International Union, United Automobile Workers of America, Local No. 76, 5 N. L. R. B. 408, 427-8 (1938), modified and enforced, N. L. R. B. v. National Motor Bearing Co., 9 Cir., 1939, 105 F.2d 652; Matter of Clifford M. DeKay and International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Local Union No. 649, 2 N. L. R. B. 231, 237 (1936).

[7] In re C. A. Lund Co. and Novelty Workers Union, Local 1866, 6 N. L. R. B. 423, 435 (1938), enforced and remanded on other grounds, N. L. R. B. v. Lund, 8 Cir., 1939, 103 F.2d 815.

[8] Century Mills, Inc., 5 N. L. R. B. 807 (1938); Denver Automobile Dealers Ass'n, 10 N. L. R. B. 1173 (1939).

[9] In re Rabhor Co., Inc., and International Ladies Garment Workers Union, 1 N. L. R. B. 470, 474-6 (1936).

[10] Cf. Taylor v. United States, 1845, 3 How. 197, 210, 11 L.Ed. 559; N. L. R. B. v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L. Ed. 831, 115 A.L.R. 307; Virginian Ry. v. System Federation No. 40, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789.

[11] See, e. g., Restatement, Agency (1933) §§ 26, 27, 33, 34, 35, 48.

[12] An instance of railroad vocabulary is cited in Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency (1937) 46 Yale L.J. 567, 569, note 10: "The following bulletin

in them, the methods of acquiring membership, the various stages and degrees of affiliation, the powers of officers to act for unions, for members, and for others, the scope of the union's powers and authority, all these things are matters peculiarly within the knowledge of workingmen.

The checkoff is distinctively a union arrangement. It exists only where there is a union. It is one of the objects unions seek, for their own as well as their members' benefit. It is unique to unionism and union membership. It is abnormal, if it ever exists, in any other application than to a union member. The nonunion man does not pay dues. He has no reason for the checkoff. The man who authorizes it has no object or motive other than to have his dues paid at the source of his income. He would not intend, except in most abnormal circumstances, to make a donation to the union, or a payment for benefit received apart from membership. If in advance of payment he promises to pay if and when the union secures a collective agreement, he authorizes them to secure it, as well as promises to pay for the benefit, which includes securing it. In short, the institution of checkoff is itself a badge of membership, and a checkoff card evidence of intention to be a member. The checkoff card therefore carries on its face the clear presumption of membership or intention to become a member. If evidence can overcome this, it must be strong indeed.

Turning to the terms of the particular instruments, the second form substantiates this by the terms "union dues" and "my initiation fee," which are to be deducted. These can have no other meaning than union membership. The other form does not contain these terms. But the payment is to be sent to the union's treasurer, the authority is to continue during the life of "the labor and working agreement" between the company and the union, and terminate when it does. Without more, the inference would seem clear that the amount deducted is not for a monthly donation by a nonmember to a union. Nor is petitioner's explanation more plausible, that the signer intended to remain a nonunion man, but to contribute a dollar a month to the union for securing the benefits of the agreement to him. Such a construction might be possible if only one or a few such

cards had been signed. But the agreements were signed during a campaign for membership. The plant was being organized. Many cards were signed at organization meetings. Each signer knew these facts and therefore that his card was one of hundreds like it being signed at the same time and for the same purpose. To apply petitioner's construction to any large number of signers would defeat the very purpose of the card. If it does not signify intention to become a member or, at the least, to authorize the union to bargain collectively for the signer, the condition stated in the authority itself for its taking effect could never occur. If all who signed these cards intended merely to pay the union for benefits they might receive from a collective agreement, without becoming members or authorizing it to negotiate such an agreement for them, the union would and could have had no standing under the law as collective bargaining representative, and the employer could have had no right to make such an agreement with it. This, for the obvious reason that the union could not be the representative of a majority of the employees, since a majority signed these cards and by signing, under the claimed construction, would evince no intention to become members. By signing them they did not intend to do an utterly futile act, to stipulate in the deduction authority itself for a condition which would make it impossible for the promise to become effective. They meant to pay on some condition, and the only one they could pay on was that the union be their representative for negotiating the agreement. Petitioner's construction would nullify the "donation" or "payment for benefit received" as well as the authority to bargain. The card must be given some effect. That can be done only if it is effective to give authority to bargain collectively.

When to these considerations are added the uncontradicted evidence concerning usage and custom in the area, among both employers and employees, to accept the cards as proof of the employees' intent that the union represent them; that the cards were delivered to the union organizers, not to the employer, by the signatories and exhibited to the management by organizers; and that employees who had signed membership application blanks sub-

---

was issued by a superintendent of the Southern Pacific Ry. in San Jose, Cal., on Dec. 20, 1928: 'All Yardmasters: Effective date, all yardmen in cannon-ball service bringing drags in yard from outside points will bleed and cut own cars.' "

stituted signed checkoff cards for them on Fritchman's instructions to use them in place of the former for soliciting members, there can be no doubt that the purpose and intent of the signers were, as the Board found, to make the cards applications for membership and authorization to the union to bargain collectively on their behalf.

■ The cards having this effect, S. W. O. C. was clearly the representative of the majority of the employees in the appropriate unit throughout the period of negotiations from December 16 to January 23, when they broke down by petitioner's refusal to deal further. The evidence on which the Board found that petitioner had refused to bargain collectively with S. W. O. C. fully substantiates the conclusion. It need not be repeated further than to point out that the company's intention, according to Phillips' own statement at the hearing, was throughout the negotiations to deal with both the "Independent Group" and the S. W. O. C. as to grievances, but with the former only as sole collective bargaining agency "until the definite status of each group was established." This, in spite of the fact that the company did not openly question the union's position as majority representative until January 20, when the negotiations were breaking up. In declining to receive the checkoff cards as evidence of authority to bargain and in delaying and finally breaking off the negotiations, petitioner took the risk that its judgment as to the legal effect of the cards might be wrong. Since it was, the finding of the Board that it has been guilty of unfair labor practice in refusing to bargain collectively is fully sustained.

· If at the beginning and later during the negotiations the company had questioned the union's majority status openly and in good faith, if it had shown disposition to investigate this carefully and promptly, and if in other respects there had been more disposition to expedite the whole matter, a different question would be presented on whether extending the negotiations over five or six weeks without finally refusing to bargain would be sufficient to constitute such a refusal. Time necessarily is required for matters of such importance and detail. Though the union was entitled to prompt attention with due regard to the complexities of the matter and the conduct of other business, it was not entitled to haste. But it is not argued that, apart

from the refusal to recognize the cards as evidence of membership or authority to bargain, there was no evidence to justify a finding of refusal to bargain. The company rests on its position that the cards were insufficient. It seems to have done so from the beginning, though it did not say so to the S. W. O. C. men until January 20. It thus consumed more than five weeks without raising the threshold inquiry concerning the majority. During this time it adhered to the position that the "Independent Group" was sole bargaining agency, though no effort was made to ascertain whether it represented a majority then or previously. In view of these facts, we think the finding of refusal to bargain is fully supported, though a different question would be presented on the time factor, if negotiations had been conducted frankly, openly and in full good faith throughout the period.

The order of the Board provides appropriate relief, and must be enforced.

It is so ordered.

STEPHENS, Associate Justice (dissenting).

The National Labor Relations Act confers upon employees "the right ... to bargain collectively through representatives *of their own choosing.*" (Italics supplied) Act of July 5, 1935, c. 372, § 7, 49 Stat. 452, 29 U.S.C.A. § 157. And in Section 8 the Act, 29 U.S.C.A. § 158, makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees ...." It is the duty of the Board and the courts to enforce these provisions. Under them the employer is required to bargain collectively with the chosen representatives of his employees and deals at his peril with anyone else; and under them no one can lawfully represent employees in collective bargaining except such persons as the employees have themselves chosen. There can be no lawful bargaining with or by self-constituted agents.

In order to convict the appellant of the unfair labor practice of refusing to bargain collectively with representatives of its employees, the Board was obliged to prove that S. W. O. C. had been authorized by a majority of the employees to represent them. I think its proof failed. It was shown that a majority of the employees had

signed check-off cards exemplified by Exhibit 5, reading as follows:

"Wage Deduction Authority

"No. 1106 Dated 11-13

"To the paymaster of

"I hereby authorize you to deduct from my wages one dollars ($1.00) per calendar month, beginning with the month of ............, 19...., provided I have worked a total of five (5)· days or more during the calendar month.

"This payment to be sent to the Secretary-Treasurer of S. W. O. C., David J. McDonald, 1500 Commonwealth Building, Pittsburgh, Pa. .

"This authority to be effective during the life of the agreement. This authority will automatically be cancelled if, as and when the labor and working agreement between your Company and the S. W. O. C. terminates.

"Charles Achenback 510 N. Lincoln Ave.

"(Signature) (Address)"

The authenticity of the signatures on these cards as signatures of employees was not disputed by the appellant. But the Board concedes that the cards do not constitute an express authorization to bargain collectively; it urges, however, that they imply such an authorization. It urges also that proof of usage was sufficient to show that the cards were intended by both the employees and S. W. O. C., and understood by the appellant, to be such an authorization.

I think it clear that the check-off cards say nothing expressly on the subject of authority for collective bargaining, and I am unable to conclude that they imply anything on that subject. If that is true, reliance must be upon proof of usage, and this must show that the cards, although without committal either express or implied in respect of collective bargaining authority, nevertheless actually meant *to the employees* of the appellant a choice of S. W. O. C. as collective bargaining representative. If the cards did not have this meaning to the employees who signed them, they can have no legal effect to constitute collective bargaining authority.

It is of course true that usage may annex terms to an agreement provided they are consistent with the express language or other manifestation of intention therein. See 3 Williston, Contracts (Rev. ed. 1936) § 648. But usage is a fact—defined as habitual or customary practice among a certain class of people, or in a trade, or neighborhood, or geographical area. Usage derives its efficacy from the assent thereto of the parties to the transaction in question. Williston, *op. cit. supra* § 649. A party cannot be bound by usage unless he either knew, or ought to have known, of its existence and nature. "Accordingly, one who seeks either to define language or to annex a term to a contract by means of usage must either show that the other party was actually aware of the usage, or must show that there was a well-defined usage generally adopted by those engaged in the business to which the contract relates, at the place where the contract was made or was to be performed. It must, if not known, be so notorious that a person of ordinary prudence in the exercise of reasonable care would be aware of it." Williston, *op. cit. supra* § 661.

The testimony concerning usage amounts to no more than the following: Harold E. Fritchman, district representative of S. W. O. C., testified:

"In all the plants which have been organized in the Reading district, since the time I have been looking after organization, which is a period of over two years, every plant which was organized, was organized on the basis of those white cards [the check-off cards]. We have been in the practice of signing those cards, and in six or seven plants in the city of Reading, the seventh being one which was organized before I came into it—

 * * * * *

"We have used the white cards in signing up members, and they have been accepted by all companies, without question, as proof that we represented a majority of the employees."

In the first place this testimony fails to establish a definite usage generally adopted because it fails to specify how many plants there were in the Reading district. It refers to six or seven in the city of Reading. For all the record shows there may have been many more in the district. But apart from this the testimony shows that the *plants* were organized on the basis of the check-off cards, that S. W. O. C. has used these cards in signing up members, and that they have been accepted by *all companies,* without question, as proof that S. W. O. C. represented a majority of the employees. This is no testimony that the cards constituted in the minds of the appellant's *employees* (or indeed in the minds of *employees* in the Reading district gen-

erally) a collective bargaining authorization. To the extent that the testimony establishes usage in respect of the check-off cards it establishes that usage only to the knowledge of S. W. O. C. and such plants and companies as it had organized. It does not at all establish the usage to the knowledge of, or bring it home at all to the employees of, the appellant; it does not show the usage to have been so notorious in the community that such employees must be charged with knowledge of it. I can give no weight to the argument of the Board and of the majority that the testimony concerning usage was uncontradicted. If the testimony was, as I think, ineffective to prove that the employees knew or ought to have known that the check-off cards, although lacking express or implied collective bargaining authorization upon their face, nevertheless were meant to constitute a collective bargaining authorization, it cannot be strengthened by an absence of contradiction.

I am unable to find anything persuasive in the majority view that no special formula or form of words is required by the National Labor Relations Act to evidence authority to bargain collectively for employees—that the Act is not a statute of frauds nor a statute prescribing the formalities of conveyancing and that lawyers' formulae and formalities are not requisite. This argument I think but sets up a straw man to knock down. There is no contention by the appellant that a collective bargaining choice has to be evidenced by a technically worded document, and no such contention can I think be fairly attributed to the insistence that there must be some substantial evidence of authority to bargain. The precisions of language necessary to the art of conveyancing and the like are of course not requisite. All that is necessary is simple words clearly indicating an intention on the part of the employees to choose as their collective bargaining representatives the persons claiming to have been so chosen. Not even such words are shown in this case.

The reliance of the majority upon the indifference of the appellant is also I think beside the point. However indifferent the appellant may have been toward bargaining with S. W. O. C., the existence of authority in the latter to represent the employees for collective bargaining purposes cannot be founded upon such indifference. It must be founded upon proof of the existence of authority, not upon proof of the asserted indifference of the employer.

I think there was no evidence that the appellant's employees had chosen S. W. O. C. to represent them for collective bargaining, and that therefore the Board's charge that the appellant had committed the unfair labor practice of refusal to bargain collectively with the chosen representatives of its employees failed of proof.