## JOY SILK MILLS, Inc. v. NATIONAL LA-
## BOR RELATIONS BOARD.

### No. 10433.

United States Court of Appeals
District of Columbia Circuit.

Decided Nov. 2, 1950.

Mr. Henry J. Fox, Washington, D. C., with whom Mr. James F. Kenney, Washington, D. C., was on the brief, for petitioner.

Mr. Bernard Dunau, Attorney, National Labor Relations Board, Washington, D. C., with whom Mr. A. Norman Somers, Assistant General Counsel, National Labor Relations Board, Washington, D. C., was on the brief, for respondent.

Before WILBUR K. MILLER, PROCTOR, and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

Joy Silk Mills, Inc., a corporation which operates a textile mill at Hartsville, South Carolina, filed a petition with this court to review and set aside an order of the National Labor Relations Board issued against it on September 13, 1949, pursuant to section 10(c) of the National Labor Relations Act, as amended by the Labor-Management Relations Act.[1] In its answer to the petition, the Board requested that this court enforce its order. The principal questions presented are whether certain statements to and interrogation of employees by the employer and his supervisory employees constitute coercive activity in violation of section 8(a)(1) of that Act, and whether there is sufficient proof that the employer refused to bargain collectively in violation of section 8 (a)(5) of the Act. We are also asked to decide whether certain questions asked employees by the employer's counsel following a charge of unfair labor practice constituted coercive activity, violating section 8(a)(1), or were privileged, and, finally, whether the Board's order was within its authority.

## I.

There is no dispute about the main outlines of the story of events at the mill. For purposes of review in this court, the parties entered into a lengthy stipulation of facts (Jt.App. 152–166), and from this we may derive the following brief summary: Petitioner normally has 50 or 60 employees working in its mill, divided among three shifts. On September 15, 1948, a minor labor dispute took place, and a strike began. Union authorization cards of the United Textile Workers of America were distributed, and by September 16 the majority of the employees had signed cards designating that union as their representative for the purpose of collective bargaining with the petitioner. Thirty-eight out of fifty-two employees signed cards. There was a meeting on September 19 between employees and the employer to discuss conditions for return to work, at which certain grievances were settled and paid vacations were promised. There was no discussion of recess periods, rotation of shifts, wages, or of the union. On September 20 the employees returned to work. On September 24 Jacobs, the union regional director in Atlanta Georgia, telephoned the president of petitioner corporation (Gilbert) concerning recognition of the union. Gilbert also received a telephone call from a representative of the Board, in reference to a consent election, and Gilbert asked that the matter be deferred until he consulted with his attorney. On September 30 a conference was held between Jacobs, Southerland (general manager of petitioner corporation), the corporation's attorney, and a field examiner of the Board, regarding the possibility of a consent election. A cross check of membership cards was suggested, and declined by petitioner. There were tentative arrangements made for a consent election to be held on October 19, which were later confirmed.

The consent election was thus set for October 19. Immediately after the telephone call of September 24 Gilbert had instructed the supervisory employees that they should in no way interfere with the union activities of the other employees. On October 7 he posted a notice informing the employees of their right to vote freely in the forthcoming election. On October 12 a statement prepared by Gilbert was read to all the employees. Southerland and Russell (plant superintendent) were present with Gilbert when the statement was read, but the actual reading was done by Carpenter, who is petitioner's bookkeeper, occupying an office next to those occupied by Gilbert and Southerland. The speech was to the effect that the management did not think unionization would benefit the employees but that they were free to vote as they saw fit. Included in the statement of October 12 was the following: "As soon as equipment for the canteen which has been ordered arrives, you will be given a rest period at the company's expense so that you may eat your

[1]. Act of June 23, 1947, 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

lunches and relax in comfort during the shift." On October 18, the day before the election, two similar speeches were read under similar circumstances, in one of which the employer said that the union was misleading the employees on the question of shift rotation, and indicated that if the majority of the employees wanted rotation the company would put it into effect.[2]

A day or two before the election Russell and Carpenter discussed the matter of the election and of the union with various employees. They questioned them concerning their views and generally indicated their own dislike for the union, that it was not a good idea to support the union, that job security might be threatened, and that perhaps wage raises and other benefits might not be forthcoming if the union got in.

## II.

Such were the preliminaries. The election was held on October 19, and the union lost. It immediately filed a protest as to the conduct of the election. This was sustained by the Board's regional director on January 25, 1949, when he ordered the election set aside and directed another election. On March 3, 1949, the union withdrew its representation petition without prejudice. Charges of unfair labor practice were filed with the Board. A hearing was held before a trial examiner on March 22-23, 1949, followed by an Intermediate Report and Recommended Decision. On September 13, 1949, the Board concluded that certain unfair labor practices had taken place, and announced its Decision and Order.

The Board affirmed the trial examiner's finding that the promises of rest periods and shift rotation included in the statements made on October 12 and October 18, 1948, constituted unfair labor practices in that "the presentation of economic benefits to employees to have them forego collective bargaining is a form of pressure and compulsion no less telling in its effort (sic: effect) on employees because benign. * * *" The findings of the trial examiner that Carpenter was a supervisory employee, and that the activities of Carpenter and Russell constituted coercion, were also affirmed. The Board affirmed the trial examiner's determination that there had been a refusal to bargain, but reversed the finding that it did not occur until October 12, holding that the violation commenced September 24, continuing thereafter.[3]

The Board ordered petitioner to cease and desist from in any manner "interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form labor organizations, to join or assist United Textile Workers of America, A. F. L., or any other labor organizations," and generally from interfering with the employees' right to engage in concerted activities and to bargain collectively through their own representatives. It also ordered petitioner to cease and desist from "refusing to bargain collectively with the United Textile Workers of America, A. F. L., as the exclusive representative of all the production and maintenance employees employed by the Respondent * * *." Affirmatively, petitioner was ordered to "upon request bargain collectively with the United Textile Workers of America" and to post certain notices at the plant.

2. The contents of the speeches were not included in the stipulation, but copies of the speeches were introduced in evidence by petitioner (Petitioner's Exhibits Nos. 7, 8, 9, Jt.App. 87-100).

3. The trial examiner had found that although there was a request to bargain on September 24, refusal to recognize the union until an election was in good faith, and that prior to October 7, when petitioner gave its final agreement to the consent election, no refusal to bargain in violation of section 8(a) (5) had occurred. The trial examiner concluded, however, that from October 12 on, when petitioner engaged in what the examiner determined were unfair and coercive activities, petitioner was no longer acting in good faith in demanding an election or in doubting the union's claim of a majority, and from that point on petitioner was seeking to evade its obligation to recognize and bargain with the union.

738

## III.

In bringing this petition to review the order of the Board, petitioner has stipulated, as we have noted, the main outline of the events which transpired. While petitioner does question certain findings which were not stipulated and as to which there is conflicting evidence, its primary challenge is to the ultimate conclusions of fact and law which have been reached by the trial examiner and the Board. It alleges that the evidence does not permit of the interpretation which it was given and is insufficient to support the determination that the petitioner has violated section 8(a) (1) and section 8(a) (5) of the Act.

The Labor-Management Relations Act provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C.A. § 160(e). The National Labor Relations Act, prior to that amendment, provided that the Board's findings "as to the facts, if supported by evidence, shall be conclusive. * * *" This latter provision had been interpreted by the Supreme Court to mean that the Board's findings were conclusive only if supported by "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N. L. R. B., 305 U.

S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126; see, also, N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299–300, 59 S.Ct. 501, 83 L.Ed. 660. The amendment, like its predecessor, does not permit the court to weigh evidence or to substitute its judgment for the Board's as to what conclusions are to be drawn from the evidence.[4] Nor does the amendment even go so far as to authorize this court to apply the test which it utilizes in reviewing findings of the District Court—that the findings are conclusive unless "clearly erroneous."[5] What the amendment was intended to do was insure that in the fringe or borderline case, where the evidence affords but a tenuous foundation for the Board's findings, the Court of Appeals would scrutinize the entire record with care, and be at liberty, where there is not "substantial evidence," to modify or set aside the Board's findings.[6] It is certainly arguable that this was exactly the rule prior to the amendment. The courts have always been free to set aside the Board's findings in a case of obvious injustice.[7] As a result the Supreme Court has indicated that the standard of review established by the present law is approximately the same as that provided in the predecessor act, N. L. R. B. v. Crompton-Highland Mills, 337 U.S. 217, 220 n. 4, 69 S.Ct. 960, 93 L.Ed. 1320, and a similar conclusion has been reached by the various courts of appeals. See, for example, Eastern Coal Corp.

4. Sen.Rep.No.105 on S. 1126, 80th Cong., 1st Sess., pp. 26–27 (1947). H.R. 3020, which in part formed the basis for the present law, provided that the Board's findings were to be conclusive only if they were not against "the manifest weight of the evidence" and were supported by "substantial evidence." H.R. Rep.No.245, 80th Cong., 1st Sess., pp. 41–42. The "manifest weight of the evidence" test was rejected in the final version of the Act.

5. Senator Taft, explaining the change, said: "It does not go quite so far as the power given a circuit court of appeals to review a district-court decision." 93 Cong.Rec., pt. 3, 395 (1947).

6. The purpose of the amendment of the section was "To enable the courts to correct glaring errors in the Board's findings. * * *" H.R.Rep.No.245 on H.R.

3020, 80th Cong., 1st Sess., p. 41 (1947). As we have noted in footnote 4, supra, the House bill provided an even broader review than the present act, and still its purpose was restricted to the correction of "glaring errors."

7. This was realized by the Congress, for the Senate report on S. 1126, contains the following statement with reference to section 10(e) of the National Labor Relations Act: "This has been construed by the Supreme Court as meaning 'substantial evidence.'" Apparently what Congress objected to under the National Labor Relations Act was "too great a tendency on the part of the courts not to disturb Board findings, even though they may be based on questions of mixed law and fact * * * or inferences based on facts which are not in the record." Sen. Rep.No.105, 80th Cong., 1st Sess., p. 26 (1947).

v. N. L. R. B., 4 Cir., 176 F.2d 131, 135; N. L. R. B. v. Austin Co., 7 Cir., 165 F.2d 592, 594–595 In any event, the test now is whether there is "substantial evidence on the record considered as a whole," and it is that test which we shall apply to the best of our ability and understanding.

IV.

■ The first question to be considered is whether or not the statements made on October 12 and 18, 1948, constituted interference or coercion in violation of section 8(a) (1). In so holding the Board pointed out that promises of benefit are at least as efficacious as threatened detriment when attempting to discourage union activity. One of the purposes of the Labor-Management Relations Act is to insure that employees shall have a free choice as to the question of their representation in negotiating with an employer. This, of course, does not preclude the employer from stating his views as to whether or not the employees should join the union. But "Employers still may not, under the guise of merely exercising their right of free speech, pursue a course of conduct designed to restrain and coerce their employees in the exercise of rights guaranteed them by the Act". N. L. R. B. v. Gate City Cotton Mills, 5 Cir., 167 F.2d 647, 649. The Act does not preclude an employer from introducing benefits during an organizational period. But when the employer uses proposed benefits as an inducement not to join the union, his activity bears no shield of privilege. For "interference is no less interference because it is accomplished through allurements rather than coercion * * *." Western Cartridge Co. v. N. L. R. B., 7 Cir., 134 F.2d 240, 244; N. L. R. B. v. Bailey Co., 6 Cir., 180 F.2d 278; N. L. R. B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 835; N. L. R. B. v. Crown Can Co., 8 Cir., 138 F.2d 263, 267. Such action "minimizes the influence of organized bargaining. It interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent." May Dept. Stores Co. v. N. L. R. B., 326 U.S. 376, 385, 66 S.Ct. 203, 209, 90 L.Ed. 145.

■ The Board has concluded that the promise of benefits here in question interfered with the employees' freedom to organize, contrary to section 8(a) (1). The employees were offered rest periods, and, if they desired, shift rotation.[8] These promises were made in the context of speeches which verbally assured the employees complete freedom of choice. But at the same time the speeches made clear that the employer did not think unionization would be to the benefit of the employees or the company. The speeches were made at a crucial time, that is, immediately prior to the election. Whether or not such promises were reasonably calculated to induce the employees not to join the union must be sensed from the entire situation. Considering the record as a whole, we think that there is substantial evidence to support the Board's conclusion. In this regard we must canvass the activities of Carpenter and Russell immediately prior to the election.

■ Russell, as we have noted, is the plant superintendent, and Carpenter the bookkeeper. Petitioner contends that Carpenter is not a supervisory employee. The Board has reached the opposite conclusion. Carpenter occupies one of the three front offices at the mill (the other two being occupied by Southerland and Gilbert). He is president of Premier Knitting Mills, which has adjoining premises, and which is related financially to petitioner, the controlling stock interests of both being identical. Carpenter meets all callers to both corporations. He has authority to hire and fire for Premier, though not for petitioner. Certainly at the time of the above-mentioned speeches he was treated as a part of the management. Under such circumstances we think the Board clearly correct in finding petitioner responsible, for purposes of the Labor-Management Relations Act, for Carpenter's actions. International As-

---

8. The second speech of October 18 indirectly promised shift rotation if a majority wanted it (Jt.App. 99). What the trial examiner relied on, however, was the testimony of Bessie Chapman that after the speech she asked Gilbert about shift rotation and he said that if the majority wanted it, they could have it (Jt.App. 115, 35–36).

sociation of Machinists v. N. L. R. B., 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50. The following are the facts testified to by various employees, found to be true by the trial examiner, and admitted by petitioner for purposes of this appeal, which relate to Carpenter's and Russell's actions:

Carpenter discussed the election with several of petitioner's employees. On the morning of the election Carpenter gave Bessie Chapman a newspaper clipping to read. The clipping was of a syndicated column,[9] containing a distinctly unfavorable commentary on union leadership. When Bessie Chapman, after reading the clipping, mentioned an old grievance against the company, Carpenter said, in reply: "Why, Bessie, I thought better of you," and then cursed the union. Carpenter then told her "you could better yourself down here if you would try." Carpenter concluded the conversation by saying, "I know I can't change your mind, there is no point in me standing here arguing with you. * * *" (Jt. App. 159–60). The day before the election Carpenter said to Henry O'Neil, "You didn't tell me which way you are going to vote, for or against the union." When he didn't reply, Carpenter at first turned away but then came back and asked, "You like your job?" (Jt.App. 160). The morning of the election Carpenter gave Jean Longrie the clipping mentioned above. Carpenter then said that the union was run by a bunch of crooks, and that if the union came in Gilbert would probably close down the mill and they would both be out of a job. (Jt. App. 160). The day before the election Carpenter said to Edna Robbins that he was surprised that she was for the union, and that he didn't think she should be a union girl, that her father (who worked elsewhere) was not a union man. She asked Carpenter how he knew she was for the union and he said that rumors got around. (Jt.App. 160). On the day of the election Carpenter asked Robert Morris how he was going to vote, and he replied that it was his own business. There was then a discussion of Morris' feelings toward Southerland and Gilbert, after which Carpenter said, "Don't go around telling people how to vote." (Jt.

App. 160–61). The same day Carpenter showed Helen Watson the newspaper clipping. He told her that he knew he couldn't do much with her, that in the office they were surprised to find out that she was the brains of the union movement, and that if he were in Gilbert's place he would tell some of the employees they could quit if they wanted to. (Jt.App. 161).

As to Russell, a day or two preceding the election Russell spoke to several employees individually about the union, noting that the union never did him any good, that all he did was pay dues. He inquired of some who had attended a prior union meeting, how many people were there, and what the union had promised. (Jt.App. 162–64). To one employee, William Chapman, Russell said he hoped Chapman had made up his mind in the right way about the election and that Russell didn't like the union and didn't think it would do any good. Russell also said, "You can't leave the union to become a foreman," and added that he "had a raise coming up" for Chapman, but if the union came in the raise might be delayed and Chapman might not get it. (Jt. App. 163).

■ Such actions on the part of supervisory employees unquestionably constitute coercion. Interrogation by supervisory employees as to union sympathies carries with it at least the aroma of coercion. Here the questioning was coupled not only with the supervisor's expressions of extreme distaste for unionism, but also with veiled threats as to future benefits and job security. Conduct of this sort violates the employees' rights under section 7 of the Act and constitutes an unfair labor practice under section 8(a) (1). H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; International Association of Machinists v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L. Ed. 50. There is no question but that there is substantial evidence to support the trial examiner's findings in this regard. Further, as we have already noted, this coercive activity lends color to the intent behind the promises of benefit discussed above and tends to substantiate the Board's conclusion that they were made to forestall un-

9. Clipped from the Charlotte Observer of October 19, 1948.

ionization of the plant. Cf. N. L. R. B. v. LaSalle Steel Co., supra.

## V.

 Was there a refusal to bargain collectively in violation of section 8(a) (5) of the Act? Before there can be a wrongful refusal to bargain, there must have been a request to bargain by the union. N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660. The Board concluded that such a request was made by Jacobs in the telephone conversation with Gilbert on September 24. Jacobs testified that he had requested recognition of the union as collective bargaining agent, stating that the union had been authorized to represent the employees; and that he had suggested a cross-check of membership cards with the payroll, by an impartial person, to prove the authorization. He further testified that Gilbert declined both requests, stating he wished to consult his attorney; that he thought the matter had been settled by an election held two years previously, which the union had lost; and that in any event he preferred to have the Board handle the matter. (Jt.App. 102-03). Gilbert testified that no request to bargain was made and that Jacobs merely said he had enough employees to petition the Board for an election if Gilbert wouldn't agree to a consent election. (Jt.App. 122, 126–28). Jacobs also testified that at the meeting of September 30 he suggested negotiating a contract to obviate the necessity of an election. (Jt.App. 110–11). Again there was contradictory testimony. (Jt.App. 146). The trial examiner chose to believe Jacobs' version of the conversations, finding Gilbert mistaken in his recollection, and concluded that there had been a request to bargain; these findings were affirmed by the Board. The circumstances of the conversations corroborate this conclusion to some extent. But apart from that, credibility of witnesses is a matter for Board determination, and not for this court. Nor must the request to bargain be in *haec verba*, so long as there was one by clear

implication. The Labor-Management Relations Act "is not a statute of frauds or an act prescribing the formalities of conveyancing. No seal or writing is required by its terms. Nor is any special formula or form of words." [10]

 The question presented is then whether Gilbert's refusal to bargain was permissible under the Act. It has been held that an employer may refuse recognition to a union when motivated by a good faith doubt as to that union's majority status. North Electric Mfg. Co. v. N. L. R. B., 6 Cir., 123 F.2d 887; N. L. R. B. v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753. When, however, such refusal is due to a desire to gain time and to take action to dissipate the union's majority, the refusal is no longer justifiable and constitutes a violation of the duty to bargain set forth in section 8(a) (5) of the Act. N. L. R. B. v. Federbush Co., 2 Cir., 121 F.2d 954, 956; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 868–869. The Act provides for election proceedings in order to provide a mechanism whereby an employer acting in good faith may secure a determination of whether or not the union does in fact have a majority and is therefore the appropriate agent with which to bargain. Another purpose is to insure that the employees may freely register their individual choices concerning representation. Certainly it is not one of the purposes of the election provisions to supply an employer with a procedural device by which he may secure the time necessary to defeat efforts toward organization being made by a union. Thus, the problem now before us narrows down to whether or not the evidence warrants the Board's inference that the refusal of recognition was in fact motivated by bad faith.

 We think that there was "substantial" evidence, viewing the entire record, from which the Board could conclude that the original refusal of recognition was in bad faith. Cf. N. L. R. B. v. Consolidated Machine Tool Corp., 2 Cir., 163 F.2d 376,[11] certiorari denied 332 U.S. 824, 68 S.Ct.

10. Lebanon Steel Foundry v. N. L. R. B., 76 U.S.App.D.C. 100, 130 F.2d 404, 407, speaking of the National Labor Relations Act.

11. Enforcing 67 N. L. R. B. 737.

164, 92 L.Ed. 399. The employer engaged in coercive activities immediately preceding the election. Interference commenced only five days after the consent election had been agreed upon. The time lapse between the first request to bargain and the election was only 26 days. In view of the totality of the evidence, it is a reasonable conclusion that the employer did not suddenly suffer a change of heart. "Wᵥ are in a field where subtleties of conduct may play no small part * * *." N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930. Neither the Board nor the courts can read the minds of men. As the Board has stated: "In cases of this type the question of whether an employer is acting in good or bad faith at the time of the refusal is, of course, one which of necessity must be determined in the light of all relevant facts in the case, including any unlawful conduct of the employer, the sequence of events, and the time lapse between the refusal and the unlawful conduct." (Jt.App. 11) Petitioner has transgressed the bounds of permissible conduct to a sufficient extent to permit the Board to conclude that its refusal to bargain was as ill-intentioned as its other actions.[12]

▮▮▮▮▮ Petitioner is correct in contending that where there has been some contrariety of opinion between the Board and the trial examiner (here both found a refusal to bargain, but differed as to when it occurred), the evidence must be examined with greater care than when both the Board and the trial examiner are in complete agreement. But this does not mean that any greater amount of evidence is required to support the Board's determination. "The Board is authorized to make findings contrary to the findings of the trial examiner, and where there is substantial evidence to support the Board's findings, the court may not set them aside merely because the Board's view of the weight and credibility

of the witnesses differed from that of the trial examiner." N. L. R. B. v. Laister-Kauffmann Aircraft Corp., 8 Cir., 144 F.2d 9, 16–17.

## VI.

Next for consideration is the Board's determination that certain questioning by counsel for petitioner immediately prior to the Board hearing of March 22 on a charge of unfair labor practices was in violation of section 8(a) (1). It was stipulated that the circumstances of the questioning were as follows: A questionnaire had been prepared by counsel for petitioner in the course of preparation for the hearing. The employees were interviewed in the canteen of the plant in groups of from four to eight employees. They were advised by counsel that the purpose of the questionnaire was to help the employer to prepare his defense and that answering the questionnaire was completely voluntary; that there would be no rewards, threats, coercion, or promises of any kind connected with the filling out of the questionnaire. They were also advised that they could omit the answer to any question or all the questions after reading them over. The employees filled the questionnaire out independently and signed each page.

The Board affirmed the conclusions of the trial examiner who held that 8 out of 28 questions asked were objectionable as constituting interference, restraint and coercion within the meaning of section 8(a) (1) of the Act. Those questions are as follows:

"7. What did you consider to be the purpose of signing the card?

"8. Did you consider yourself a member of the Union when you signed the card?

"9. At the time you signed the card, did you pay any money for membership or other fees in the Union?

---

12. It was stipulated that there was testimony that on the morning of the election Carpenter stated to union representatives that they "hadn't any damn business interfering with the operations of our plant," that they were "just as red as Joe Stalin," and that "before we see the union come in here we will burn the goddamned plant down and throw the key away and the employees here know that we will do it." Carpenter denied making the last statement, but the trial examiner found testimony regarding it to be substantially true, and it was admitted for purposes of review here. (Jt.App. 162).

"10. Did you agree to the future payment of any membership, initiation or other fees to the Union?

"13. Did you terminate your connection with the Union at any time after you signed a card?

"14. If so, for what reason did you terminate your connection with the Union?

"21. Did you cast your vote at the election solely according to your own personal views concerning whether you desired the Union to represent you and without any fear or threats as to your job and future with the Company, and without being influenced in any respect by promise of future benefits by the Company?

"25. Did you consider that these speeches or the statements and notices posted on the bulletin board were threats or promises of benefits to influence your vote against the Union?"

 The Board has held that "an employer is privileged to interview employees for the purpose of discovering facts within the limits of the issues raised by a complaint, where the employer, or its counsel, does so for the purpose of preparing its case for trial and does not go beyond the necessities of such preparation to pry into matters of union membership, to discuss the nature or extent of union activity, to dissuade employees from joining or remaining members of a union, or otherwise to interfere with the statutory right to self-organization." In the Matter of May Department Stores Co., 70 N.L.R.B., 94, 95.

Apparently this rule means that an employer may question his employees in preparation for a hearing but is restricted to questions relevant to the charges of unfair labor practice and of sufficient probative value to justify the risk of intimidation which interrogation as to union matters necessarily entails; and that even such questions may not be asked where there is purposeful intimidation of employees. Such a standard assumes that interrogation of employees concerning their union activities is, of itself, coercive,[13] but that fairness to the employer requires that a limited amount of such questioning be permitted despite the possible restraint which may result.

 We think that the standard established by the Board, as just described, is a reasonable one, and aptly designed to carry out the purpose of the Act. We think that it has been correctly applied in this case. The fact that the fruits of the questioning are to be used in preparation for a hearing does not make the interrogation any less coercive. The questions which have here been held violative of the Act, while perhaps relevant to the charges made against the employer, would yield little in the way of proof as to whether or not unfair labor practices have been committed. This is especially true of those which deal with the employee's subjective state of mind, such as questions 7, 8, 14, 21, and 25. See N. L. R. B. v. Donnelly Garment Co., 330 U.S. 219, 230-231, 67 S.Ct. 756, 91 L.Ed. 854. It has been held that an employee's thoughts (or afterthoughts) as to why he signed a union card, and what he thought that card meant, cannot negative the overt action of having signed a card designating a union as bargaining agent. N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 790; N. L. R. B. v. Consolidated Machine Tool Corp., 67 N.L.R.B., 737, 739, enforced 163 F.2d 376, certiorari denied 332 U.S. 824, 68 S.Ct. 164, 92 L.Ed. 399. Similarly, it has been consistently held that the question is

---

13. "Inquiry by the employer of the employees' union affiliations has been held to be violative of the Act." Texarkana Bus Co. v. N. L. R. B., 8 Cir., 119 F.2d 480, 483. See Matter of Standard Coosa-Thatcher Co., 85 N. L. R. B. 1358, when the Board stated the reason for this determination: "Our experience demonstrates that the fear of subsequent discrimination which interrogation instills in the minds of employees is rea-

sonable and well-founded. The cases in which interrogated employees have been discharged or otherwise discriminated against on the basis of information obtained through interrogation are numerous. These cases demonstrate conclusively that, by and large, employers who engage in this practice are not motivated by idle curiosity, but rather by a desire to rid themselves of union adherents." (Footnote omitted) (at p. 1362).

not whether an employee actually felt intimidated but whether the employer engaged in conduct which may reasonably be said to tend to interfere with the free exercise of employee rights under the Act. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368; N. L. R. B. v. Ford, 6 Cir., 170 F.2d 735, 738. We think the Board was justified in its conclusion that questions 7 through 14, 21, and 25 were violative of section 8(a) (1), in that the evidence which could be garnered from that questioning would be of so little probative value as not to warrant the risk of infringing upon employee rights.

## VII.

There remains for consideration whether. the Board's order should be enforced in full or should be modified in some respects.

■■■ First, as to that portion of the order relating to the refusal to bargain: If the Board is correct in its finding that the employer refused to bargain in violation of section 8(a) (5), its order that the employer bargain collectively with the union is within its authority, and is amply sustained by precedent. This is true despite the fact that the union lost the consent election. · The Board has concluded that the union's loss of strength was due to petitioner's coercive activities. It has also concluded that prior to the engagement in that coercion the union had a large majority. The Board is specifically empowered "to take such affirmative action * * * as will effectuate the policies of this chapter." 29 U.S.C.A. § 160(c). It has been consistently held by the Supreme Court that where an employer refuses to bargain collectively with a majority union, and the union loses its majority status because of the employer's coercive activities, suffering the loss of an election, it is appropriate for the Board to order the employer to bargain with the union. Franks Bros Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; N. L. R. B. v. P. Lorillard Co., 314 U.S. 512, 62 S. Ct. 397, 86 L.Ed. 380; N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 339-340, 60 S.Ct. 918, 84 L.Ed. 1226.

In Franks Bros. Co. v. N. L. R. B., supra, Mr Justice Black, speaking for a unanimous court, said:

" 'It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged.' * * *

"That determination the Board has made in this case and in similar cases by adopting a form of remedy which requires that an employer bargain exclusively with the particular union which represented a majority of the employees at the time of the wrongful refusal to bargain despite that union's subsequent failure to retain its majority. The Board might well think that, were it not to adopt this type of remedy, but instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by an employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union membership indefinitely to postpone performance of their statutory obligation. * * * That the Board was within its statutory authority in adopting the remedy which it has adopted to foreclose the probability of such frustations of the Act seems too plain for anything but statement. See 29 U.S.C. § 160(a) and (c), 29 U.S.C.A. § 160(a, c).

"Contrary to petitioner's suggestion, this remedy, as embodied in a Board order, does not involve any injustice to employees who may wish to substitute for the particular union some other bargaining agent or arrangement. For a Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. * * * But, as the remedy here in question recognizes, a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed. * * * After such a reasonable period the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships." 321 U.

S. at pages 704-706, 64 S.Ct. at page 818.

The decision in Franks Bros. Co. v. N. L. R. B., supra, appears controlling, and the order of the Board is entitled to be enforced in the respect just discussed.

As to that portion of the order requiring the petitioner to cease and desist from refusing to bargain, what has been said above is equally applicable, and the order must likewise be enforced.

■ In addition to ordering petitioner to cease and desist from refusing to bargain, and, affirmatively, to bargain upon request, the Board, in paragraph 1(b) of the order, ordered petitioner to cease and desist from "In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form labor organizations, to join or assist United Textile Workers of America, A. F. L., or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection and to refrain from any or all activities, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as condition of employment as authorized in Section 8(a) (3) of the Act as guaranteed by Section 7 thereof."

A majority of this court does not believe that the pattern of coercion developed here warrants the issuance of paragraph 1(b) of the order, as quoted, and its enforcement by this court.[14]

A modified form of order, eliminating paragraph 1(b) and otherwise conforming to this opinion, may be submitted. The notice to employees required in paragraph 2 (b) should conform to the order.

As so modified, the order is affirmed and will be enforced.

So ordered.

WILBUR K. MILLER, Circuit Judge, dissents, being of the view that no part of the Board's order should be enforced.

14. The writer does not agree with this conclusion, but believes that paragraph 1(b) of the order is entitled to enforcement. The petitioner here interfered with the concerted activities of its employees in certain specific ways which have been discussed above, namely, by interrogation, threats, and offering benefits as an inducement not to join the union, as well as refusing to bargain with the designated representative of the employees. "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past." N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930. "The test of the proper scope of a cease and desist order is whether the Board might have reasonably concluded from the evidence that such an order was necessary to prevent the employer before it 'from engaging in any unfair labor practice * * * affecting commerce.'" May Dept. Stores Co. v. N. L. R. B., 326 U.S. 376, 390, 66 S.Ct. 203, 211, 90 L.Ed. 145. See cases cited therein 326 U.S. at page 389, note 10, par. 1(b), 66 S.Ct. at page 241. For alternative procedures, see Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, 13, 65 S.Ct. 478, 89 L.Ed. 661; Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 55, 68 S.Ct. 822, 92 L.Ed. 1196; N. L. R. B. v. Lipshutz, 5 Cir., 149 F.2d 141, 142; Wilson & Co. v. N. L. R. B., 8 Cir., 123 F.2d 411, 419.