401 F.2d 925
 130 U.S.App.D.C. 384
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SAGAMORE SHIRT COMPANY, d/b/a Spruce Pine Manufacturing Co.,
Respondent, Amalgamated Clothing Workers of
America, AFL-CIO, Intervenor.
 No. 21369.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 14, 1968.
Decided June 28, 1968.
 
 Mr. Warren M. Davison, Atty., N.L.R.B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Mrs. Abigail Cooley Baskir, Atty., N.L.R.B., were on the brief, for petitioner.
 Mr. J. W. Alexander, Jr., Charlotte, N.C., for respondent.
 Mr. Jacob Sheinkman, New York City, entered an appearance for intervenor, and moved the admission of Mr. Robert T. Snyder, New York City, of the bar of the Court of Appeals of New York, pro hac vice, for intervenor.
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.
 PER CURIAM:
 
 
 1
 The differences between respondent Company, a manufacturer of shirts, and the Board, arising under the National Labor Relations Act, are before us now a second time. As they were here first our decision is reported in Amalgamated Clothing Workers of America, AFL-CIO v. N.L.R.B. and N.L.R.B. v. Sagamore Shirt Co., 124 U.S.App.D.C. 365, 365 F.2d 898. We there upheld the Board in deciding that the Company, in its relations with the Amalgamated Clothing Workers of America, AFL-CIO, had violated Sections 8(a)(1) and 8(a)(5) of the Act, subject in certain respects, however, to the result of a remand for hearing and determination of the status of floorladies employed at the Company's plant.[1] The status of the floorladies was important because it was on the basis of the Board's classification of them as supervisors that both the 8(a)(1) and 8(a)(5) violations in part depended.
 
 
 2
 On remand the Board adopted the findings of the Trial Examiner, with which we are in accord, that the floorladies were supervisors as defined in Section 2(11) of the Act and that, therefore, their conduct and statements were attributable to the Company for purposes of determining violations of Section 8(a)(1). Accordingly, the Board reaffirmed its order that the Company should cease and desist from engaging in conduct of the type which the Board had previously found it had engaged in because of the activities of the floorladies. The Board also reaffirmed its exclusion of the floorladies from the bargaining unit in requiring the Company to bargain collectively with Amalgamated. If we adhere to the terms of the remand we would be obliged to enforce the order in its present terms.
 
 
 3
 The Company, however, assuming arguendo that the floorladies were supervisors, insists that the Board improperly refused to permit the Company to reopen the record with respect to the validity of the union's authorization cards. The facts are these: At the first hearing the Trial Examiner rejected as cumulative the testimony of numerous employees as to the means by which the cards had been obtained from them. This court upheld the action of the Trial Examiner because respondent's counsel first proffered the employees 'solely for testimony that they had voluntarily gone to see Shay (the plant manager) to tell him of their opposition to the Union,'[2] a point on which there was already ample testimony in the record. Moreover, when counsel formalized his proffer he stated, according to the transcript, that these employees would testify 'that they were asking for an election and joining the union.' We held that 'that proffer would not have established that the employees had only been told that the purpose of the cards was for an election,'[3] and therefore that the rejection of the testimony was sound.
 
 
 4
 The Company claims, however, that the transcript before this court in 1966 was in error because it omitted the word 'not' in counsel's second proffer. Allegedly the proffer was that these employees would testify that 'they were asking for an election and not joining the union.' But there was no effort to have this court enlarge the scope of our remand on the basis of an alleged error in the transcript affecting testimony on which the court had relied. At the second hearing on the remand, held pursuant to this court's order that the Company be permitted to litigate the issue of the supervisory status of the floorladies, counsel did move to correct the record to make it reflect what he claims was actually said. The Trial Examiner, who was the same in both hearings, granted the motion so that the transcript would read in accordance with his memory of what counsel's intention had been. He refused, however, to permit the Company to introduce further testimony by the employees as to what they had been told by the union organizers.
 
 
 5
 The Board overruled the Trial Examiner, holding that the Trial Examiner had no authority to permit the corrections of the transcript. The Board stated as its reasons, in part:
 
 
 6
 In our opinion, this matter could and should have been timely brought to the attention of the Board two years ago or to the Court's attention when the proceeding was pending before it. Additionally, when the Court remanded the case to the Board, it apparently did so for the limited purpose of determining the status of the floorladies. The Trial Examiner, as well as the Board, does not have the authority to exceed the scope of the Court's remand.
 
 
 7
 First, we may assume that the court, responsible for the terms of the remand, need not be bound by any law of the case in this matter. Similarly, we need not decide the extent of the Board's power to correct transcripts where such corrections may affect the conduct of further proceedings before the Board on a matter that has been remanded. For clearly the sound procedure when counsel feels that the court has rested its decision on erroneously transcribed proceedings is promptly to bring the matter to the court's attention so that, regardless of whether there is controversy as to the fact of transcript error, proper directions for resolving that issue and any others flowing from it may be determined. We do not say that failure to follow such a course will automatically preclude the correction from being made and subsequently acted on. We do say that when this procedure is not followed the court will at least be concerned lest there be possible advantageous consequences from the omission to bring the error promptly to its attention.
 
 
 8
 In this case, such consequences are possible. Whether or not they served as the motivation for the procedure followed, their presence leads us to decline, in view of the long delay already experienced, to send the matter back for another hearing. The failure to obtain prompt clarification from the court has an obvious consequence in terms of delay. Granting the Company the benefit of all its arguments, we would still have to remand the matter for another hearing before the Trial Examiner so that he could consider the employee-testimony as to what the union organizers had said. Proffers are not proof, and the Trial Examiner must have an opportunity to determine not only whether the witnesses will testify as claimed by counsel, but also whether their testimony, in light of their demeanor, is credible. We have recently pointed out doubts that arise as to the credibility of employees testifying under the eye of the employer long after the event, as to statements which were not brought out in an earlier Board investigation.[4] Secondly, time is an employer's weapon in these disputes and we cannot ignore the Board's finding, supported by substantial evidence, that the Company's supervisors engaged in a pattern of 8(a)(1) violations designed to destroy whatever union support ever existed at the plant.
 
 
 9
 Doubtless Company counsel will ascribe any unnecessary delay to the Trial Examiner's refusal to broaden the remand proceeding for new testimony. But it is indeed one thing to correct a transcript and another to broaden the scope of a remand beyond that contemplated by a reviewing court.
 
 
 10
 Had the Company indicated to the court the errors in the transcript, the court would have focused on the sufficiency of its proffers, as corrected. The relevant part of the corrected proffer is 'there are people who are named in Mr. Anglin's petition for intervention, who signed cards, who have not testified, who will say that they signed upon the assurance of the union men that a majority of the employees were signed before they had signed; that they were asking for an election and not joining the union; * * * and that they were opposed to the union in October. * * *'
 
 
 11
 If the transcript had been corrected, a question would have arisen as to the meaning of the critical clause, 'that they were asking for an election and not joining the union.' At least two meanings are possible. Meaning A is that the Union organizers had assured the employees that they (the organizers) were asking only for an election and were not asking the employees to join the union. Meaning B, which far better accords with the contextual use of the word 'they,' is that they (the employees) were asking for an election by signing the cards and were not intending to join the union. If the clause is given Meaning A, then the Trial Examiner would have been in error in excluding further testimony under the Board's Cumberland rule.[5] With Meaning B, however, it was not necessarily error to reject the testimony, since it went only to the subjective and probably undisclosed intention of the employees, and not to what the organizers said, in signing the cards.
 
 
 12
 Moreover, the correction of the transcript would not have upgraded the specificity of the third proffer. There the relevant language is 'As to those who signed cards; those on this list who signed cards, they were told by the union organizer that the union had a majority signed up at the time they were solicited, and that they were asking, not for membership in the union, but for an election to be held at the plant.' Here, too, there is the same ambiguity as to the meaning of the word 'they.' Does it refer to the union organizers or to the employees?
 
 
 13
 Had the Company come to the court promptly after the issuance of the 1966 opinion to point out the error in the transcript, the Board would have had the opportunity to press on the court that 'they' meant employees.[6] We need not at this juncture concern ourselves with how we would have reacted in 1966 to this problem of meaning-- whether we would have decided it or perhaps have remanded it to the Board for its consideration of the problem. The point is that the Company's course in proceeding on the remand, rather than coming back to the court for clarification, made available a tactical advantage of relying in the proceedings below on this court's assumption that 'they' referred to the union organizers. Had the matter been opened again, the entire question of the sufficiency of the proffers would have been swept under the table.
 
 
 14
 Again, we emphasize that we impute no improper motive whatever to counsel. Good procedure, however, dictated that a problem like this be promptly brought to the court's attention, lest litigation over it consume further time during which employees who want collective bargaining are without it. Accordingly, we consider that the interest of justice does not require further proceedings now on this point.
 
 
 15
 We adhere to our previous rulings, now reinforced by the determination of the status of the floorladies as supervisors. We do not feel justified in requiring the parties to attempt on another remand to recreate the situation as it existed in October, 1963, on the theory that it could be recreated in a manner which would be more accurate in respects material to the 8(a)(5) violation than is reflected in the present decision of the Board. We think the policies of the Act are effectuated by enforcement of the Board's order in its present terms, any change in the bargaining status of Amalgamated to await such proceedings as might thereafter be available under the Act.[7]
 
 
 16
 It is so ordered.
 
 
 
 [1]
 In one respect no longer material we denied enforcement of the order of the Board; and in still other respects we denied the petition of Amalgamated that we broaden the order
 
 
 [2]
 124 U.S.App.D.C. at 375, 365 F.2d at 908
 
 
 [3]
 Ibid. We also noted that in listing his witnesses individually, counsel made a third projection of their testimony, and we stated that this forecast was that 'they would testify that they were told the only purpose of the cards was to obtain an election.' Ibid. We held, however, that any revision of the proffers was not made suficiently clear fairly to put the Trial Examiner on notice of the difference in the proposed testimony
 
 
 [4]
 International Union, United A., A. & A. Imp. Wkrs., etc. v. N.L.R.B. (Preston Products Co.), 129 U.S.App.D.C. 196, 392 F.2d 801, cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (June 10, 1968)
 
 
 [5]
 Cumberland Shoe Corp., 144 NLRB 1268 (1963), enforced N.L.R.B. v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965)
 
 
 [6]
 In the 1966 opinion the court assumed that the word 'they' in the third proffer referred to the union organizers, but nothing turned on this
 
 
 [7]
 The 8(a)(1) activities for which the Company must be held responsible, contemporaneously with Amalgamated's claim of bargaining rights, were of a character calculated to prevent the maintenance of Amalgamated's majority if it existed. Such activities furnished a permissible basis for a Board inference adverse to the Company's good faith in refusing to recognize the Union. Joy Silk Mills v. N.L.R.B., 87 U.S.App.D.C. 360, 369-370 185 F.2d 732, 741-742, cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350