363 F.2d 702
 124 U.S.App.D.C. 215
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Aero
Corporation, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
AERO CORPORATION, Respondent, International Union United
Automobile, Aerospaceand Agricultural Implement
Workers of America, AFL-CIO, Intervenor.
 Nos. 19616, 19636.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 25, 1966.
Decided June 15, 1966.
 
 Mr. Joseph L. Rauh, Jr., Washington, D.C., with whom Messrs. John Silard, Stephen I. Scholssberg and Mrs. Harriett R. Taylor, Washington, D.C., were on the brief, for petitioner in No. 19616 and intervenor in No. 19636.
 Mr. Jules H. Gordon, Attorney, National Labor Relations Board, of the bar of the Court of Appeals of New York pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Gary Green, Attorney, National Labor Relations Board, were on the brief, for respondent in No. 19616 and petitioner in No. 19636. Mr. Peter M. Giesey, Attorney, National Labor Relations Board, also entered an appearance for respondent in No. 19616 and petitioner in No. 19636.
 Mr. James P. Swann, Jr., Atlanta, Ga., with whom Messrs. Alexander E. Wilson, Jr., and John E. Branch, Atlanta, Ga., were on the brief, for intervenor in No. 19616 and respondent in No. 19636.
 Before DANAHER, WRIGHT and LEVENTHAL, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 These consolidated cases are here on the petition of the National Labor Relations Board to enforce its order against Aero Corporation (Company), and on the petition of the United Automobile, Aerospace and Agricultural Implement Workers (Union) to review a portion of the order.
 
 
 2
 The Board, in agreement with the Trial Examiner, found that the Company had violated Section 8(a)(1) of the National Labor Relations Act[1] by interfering with the protected rights of its employees to organize, Section 8(a)(3) of the Act by discharging certain employees to discourage union membership, and Section 8(a)(5) of the Act by refusing to bargain with the Union. The Board declined to find violations of the Act in the discharge of other employees active in support of the Union, and in the alleged surveillance activities of still another employee. We are convinced that the underlying findings of the Board are supported by substantial evidence on the record as a whole. Accordingly, we deny the Union's petition for review and grant the Board's petition for enforcement.
 
 
 3
 The facts as established by these findings may be stated briefly. This labor controversy arose at the Company's Lake City, Florida plant, where it engages in the repair, overhaul, and maintenance of aircraft. Early in 1962 some of its employees became interested in organizing for the purposes of collective bargaining, and contacted representatives of the Union. The first organizational meeting was held in February 1962; a member of the Union spoke and Union authorization cards were distributed. By April 9, the Board found, a majority of the employees then in the unit had signed the authorization cards. On that date, the Union formally requested the Company to bargain. The following day, the Union petitioned for a Board election. On April 16, in Company declined to bargain with the Union, stating that it would insist on an election before recognizing the Union.[2] In the following months, the Company through its foremen, plant manager, and vice-president interrogated employees with respect to their Union sympathies, spied on organizational meetings, threatened that the plant would close or move out of the state if the Union won the election, and discharged several employees who were active in the Union campaign.
 
 
 4
 On June 1, 1962, an election was held. The Union lost by a vote of 49 to 43.[3] On the application of the Union, the NLRB Regional Director set the election aside because the Company's activities had interfered with the free choice of the employees. The Company, however, continued its unlawful conduct, and on July 31, the Union filed a Section 8(a)(1) charge. A second election was held on August 10, 1962. The Union again lost, this time by a vote of 59 to 55. The Regional Director again set aside the election became of the conduct of the Company, and on October 25, 1962, the Union filed charges that the Company had violated Section 8(a)(5) by refusing to bargain. Upon determining that the Company had committed the unfair labor practices alleged, the Board ordered that the Company cease and desist, and affirmatively, that it post the usual notices, reinstate certain employees, and bargain with the Union. We now proceed to discuss the principal issues raised with respect to the Board's order.
 
 I. Union Authorization
 
 5
 It is urged that the authorization card used by the Union is ambiguous and does not constitute an unequivocal designation of the Union as the representative of the signer for collective bargaining purposes. It is further contended that the Trial Examiner erred in not permitting the Company 'to determine from all alleged card signers the purpose for which the card was executed.' We find these contentions without merit.
 
 
 6
 The card[4] specifically states that it is an 'Authorization to UAW,' and its first sentence reads: 'I, the undersigned employee of ---------- (name of company) authorize UAW to represent me in collective bargaining.' To be sure, the fine print at the bottom of the card says that it is for use in support of a demand for recognition, 'or for an NLRB election.' But we agree with the Board that notwithstanding the fine print the overall purpose of the card is clear.
 
 
 7
 The Company relies on NLRB v. Peterson Bros., Inc., 342 F.2d 221 (5th Cir. 1965). We approve the reasoning of the Seventh Circuit in NLRB v. C. J. Glasgow Co., 356 F.2d 476, 478 (1966), which rejects the Peterson case and points out that the card--
 
 
 8
 expressly confers the requisite authority. The recital of alternate methods by which the card might be used to make the authority operative with respect to the employer in our opinion neither negates the grant nor beclouds it with ambiguity.
 
 
 9
 It was therefore proper to refuse to permit the employer to inquire into the subjective understanding of the employee who signed the card. At oral argument, counsel conceded that the Company had been permitted to inquire as to the representations made at the times the cards were distributed, i.e., to question whether there were misrepresentations. That is all that need be allowed. Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951); NLRB v. C. J. Glasgow Co., supra.[5]
 
 II. Limitation Period
 
 10
 The Company contends that the complaint of the refusal to bargain related to an 'unfair labor practice occurring more than six months prior to' the service of a copy of the charge filed with the Board and is therefore barred by Section 10(b).[6] The refusal to bargain charge was filed by the Union on October 25, 1962, and served the next day. Thus the Board must establish an unfair labor practice occurring on or after April 26, 1962.
 
 
 11
 The Company's letter of April 16, 1962, responded to a Union demand to bargain in the following terms:
 
 
 12
 Your recent letter requesting recognition as exclusive bargaining representative for our employees has been received. It is our opinion that our employees do not desire your union to represent them.
 
 
 13
 In any event, we must insist that our employees be given an opportunity to vote on this important matter in an NLRB election before we assume that you have captured them.
 
 
 14
 In finding that the refusal to bargain charge was not barred, the Examiner and the Board concluded that the refusal was a continuing one and that the Company had no doubt throughout the permissible period that the Union claimed a majority and was seeking recognition. In addition the Board referred to a statement made by Company counsel at an April 26 hearing on the Union's first petition for an election to the effect that the Company 'still decline(d) to recognize' in the absence of an election. An attorney's reaffirmation of the Company's position arising out of a past action should not ordinarily of itself be sufficient to constitute a reoccurrence for the purpose of a limitation provision. Nevertheless, there are other aspects of this case which lead us to conclude that the charge is not barred.
 
 
 15
 The Board was justified in construing the Union's demand and the Company's refusal as a continuing demand for recognition and bargaining, and a continuing refusal, when another 'formal demand in light of the Company's prior peremptory refusal would have been useless.' Local No. 152 v. NLRB, 120 U.S.App.D.C. 25, 28, 343 F.2d 307, 310 (1965). This was not a case of mere Company inaction for six months following a refusal to bargain. The continuing nature of the Company's refusal in this case is clear from the Board's findings that the Company's determination to refuse to recognize and bargain was actively implemented in the months following its letter by its efforts to undermine the Union.
 
 
 16
 4, 5$ The Company contends that the continuing offense theory is impermissible in light of Local Lodge No. 1424 International Assoc. of Marchinists v. NLRB, 362 U.S. 411, 80 S.Ct. 822. 4 L.Ed.2d 832 (1960). That decision cannot be viewed so broadly. When within the six-month period there has been active conduct, as contrasted with mere passive inaction following an old offense, it is open to the Board to refer to previous acts 'to shed light on the true character of matters occurring within the limitations period.' 362 U.S. at 416, 80 S.Ct. at 826. In effect what was involved started was a basic Company approach started more than six months prior to the charge, but carried forward by more recent actions. The Board in effect viewed the actions within the six-month period as reiterations by deed of the underlying refusal to bargain and hence as establishing a violation of Section 8(a)(5).[7] We think this was within its authority under the Act.
 
 III. Use of Protected Statements
 
 17
 The Company insists that statements protected by Section 8(c)[8] of the Act were used by the Trial Examiner and the Board for purposes inconsistent with the protection granted by that section. It claims statements were used to judge the credibility of Company witnesses, to establish the bad faith refusal to bargain, and in short as some evidence of the unfair labor practices themselves. We do not so read either the decision of the Examiner or that of the Board. There is a vast difference between the use of protected statements as evidence of an unfair labor practice, and the use of such statements to draw the background of the controversy and place other nonverbal acts in proper perspective. The latter is all the Board did here. The evidence recited by both the Examiner and the Board relates to specific acts of various agents of the Company. The references to protected statements or speeches merely placed the other acts in context. This limited use is sanctioned by Hendrix Mfg. Co. v. NLRB, 321 F.2d 100 (5th Cir. 1963), cited by the Examiner.
 
 
 18
 In particular, the Company states that the Examiner used protected material to place 'all management representatives in the 'liar' column,' and for the 'mass discrediting of all company witnesses.' We find no support in the record for this exaggerated characterization of the Examiner's method of decision. We have been shown nothing from which it could be inferred that the Examiner strayed from his role as an objective and impartial fact-finder. Moreover, the Board in its decision did not refer to the protected material, and its decision is supported by substantial evidence on the record as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 492-497, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 IV. Supervisory Personnel
 
 19
 Two low-level supervisory personnel apparently passed out some of the authorization cards, and there is some evidence to show that one solicited signatures.[9] The Company argues that their participation taints all of the authorization cards.[10] There is substantial evidence to support the Board's finding that the limited participation and unclear status of the persons invoved negatived the possibility that they may have coerced employees into signing up against their wishes. moreover, whatever merit this Company contention might have had at a time when the Union was petitioning for an election based on the cards, the relief sought now is unavailable. The Board reasoned that to permit an employer to rely on the participation of marginal supervisory personnel in the Union's campaign to justify after the fact its refusal to bargain with the Union would encourage it to allow such participation in hopes of later, in the event of a Union majority, obtaining an order either setting aside an election or upholding the refusal to bargain. This seems to us a permissible ruling in determining the application of the Act, where the complaint does not charge Company domination of a union or efforts to further the cause of a particular union.
 
 V.
 
 20
 The Board ordered the Company to reinstate four employees it found to have been discharged to discourage union membership. The Company disputes the findings as to each. The Union asserts that the Board should have found that an additional employee had been so discharged.[11] We are satisfied that the Board's conclusions are supported by substantial evidence.
 
 
 21
 We have considered the Union's assertion that the Company committed additional Section 8(a)(1) violations through the activity of a test pilot who officiously spied upon some organizational meetings. Since there is substantial evidence supporting the Board, its resolution of this question must stand.
 
 
 22
 We have also considered the other numerous objections of the Company and do not find them persuasive, separately or together.
 
 
 23
 The Union's petition for review is denied. The Board's petition for enforcement of its order is granted.
 
 
 24
 It is so ordered.
 
 
 
 [1]
 49 Stat. 449 (1935) and 61 Stat. 136 (1947), as amended, 29 U.S.C. 151-168 (1964)
 
 
 [2]
 Refusal to bargain with a union that possesses valid authorization cards of a majority of the employees in a unit, and insistence upon an election, when the action is motivated not by a good faith doubt as to the union's majority status but rather by a desire to obtain time in which to undermine the union, is a violation of 8(a)(5). Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951); International Union of Elec. Workers (S.N.C. Mfg. Co.) v. NLRB, 122 U.S.App.D.C. 145, 352 F.2d 361, cert. denied 382 U.S. 902, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965)
 
 
 [3]
 In addition there were four challenged ballots, two of which had been cast by employees discharged by the Company for reasons the Board found to have been in violation of 8(a)(3)
 
 
 [4]
 The following is a facsimile of the card:
 AUTHORIZATION TO UAW
 Fill All Blanks
 Date...............
 I, the undersigned employee of
 ........................................lo
 (Name of Company)
 authorize UAW to represent me in collective bargaining.
 Signature of Employee ..............................
 Name of Employee-- Please Print ...................
 Home Address ..................................
 City ...................................... State ..........
 Class of Work .............................. Shift ..........
 Telephone No. ................Badge or Clock No. ..........
 This is not an application for membership. This card is for use in support of the demand of (UAW), American Federation of Labor and Congress of Industrial Orgainzations (AFL-CIO) for recognition or for an NLRB election.
 Form A-17-Rev. 3-55.
 Printed in U.S.A.
 
 
 [5]
 As we said in Joy Silk Mills, supra
 An employee's thoughts (or afterthoughts) as to why he signed a union card, and what he though that card meant, cannot negative the overt action of having signed a card designating a union as bargaining agent. (87 U.S.App.D.C. at 371, 185 F.2d at 743.)
 The card here is identical to that in Glasgow, and substantially similar to that in Peterson. It is plainly less objectionable than the card underlying the Board's order which we enforced in International Union of Elec. Workers (S.N.C. Mfg. Co.) v. NLRB, supra note 2.
 
 
 [6]
 29 U.S.C. 160(b) (1964)
 
 
 [7]
 The Board also stated: ,'moreover, even if the 10(b) period of limitations were fatal to an 8(a)(5) finding, an affirmative bargaining order would be appropriate to remedy the 8(a)(1) violations found herein, and to restore the status quo ante.' 149 N.L.R.B. 1283, 1285 n. 3. This point is also well taken. See Local 152 v. NLRB, 120 U.S.App.D.C. 25, 27, 343 F.2d 307, 309 (1965); NLRB v. Delight Bakery, Inc., 353 F.2d 344, 347 (6th Cir. 1965). This is a separte and distinct ground of decision since there may be actions within the six-month period that suffice to continue a 8(a)(5) violation even if they could not independently be found as violations of 8(a)(1)
 
 
 [8]
 29 U.S.C. 158(c) (1964)
 
 
 [9]
 Although the Board held that the worker was a supervisor, it noted that she had been told by her foreman that she was not a supervisor, that a letter circulated during the campaign by the Company's supervisors did not contain her signature, and that she voted in one of the elections without challenge
 
 
 [10]
 The Company says that the record shows that four cards were obtained by the two supervisors. The Examiner found that the cards allegedly obtained by them had been lost in the mail. The Board, however, did not rely on this finding
 
 
 [11]
 The Examiner found that the employee's didcharge was based 'primarily upon departmental seniority.' The Union seizes upon the word 'primarily' and suggests that it implies the discharge was in part motivated by Company knowledge of the employee's union activity. In our view of the record, the Examiner was referring to an additional reason for the discharge given by the employee's supervisor, namely, that the employee had asked to be one of the first to be laid off under a contemplated reduction in force