**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOS ANGELES YUMA FREIGHT LINES et al., Respondents.**

No. 25151.

United States Court of Appeals, Ninth Circuit.

July 27, 1971.

Thomas Silfen (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Deputy Asst. Gen. Counsel, Washington, D. C., C. Woodward Greene, Director, NLRB, Albuquerque, N. M., for petitioner.

Goldstein, Gentile & Kirshman, Beverly Hills, Cal., for respondents.

Before BARNES, DUNIWAY and WRIGHT, Circuit Judges.

DUNIWAY, Circuit Judge:

The National Labor Relations Board petitions to enforce its order directing Los Angeles-Yuma Freight Lines and Svensson Freight Lines (collectively, the Company) to cease and desist from refusing to recognize and bargain collectively with Locals 104, 208, and 357 of the International Brotherhood of Teamsters and from refusing to reinstate unfair labor practice strikers in violation of sections 8(a) (5) and (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (5) and (1) and (3). The Board further ordered the Company to take certain affirmative action.

A full understanding of the factual context of this case requires a familiarity with the nationwide multiemployer bargaining between the Teamsters In-

ternational and Trucking Employer's, Inc., during late 1963 and early 1964 which culminated in adoption of a national collective bargaining agreement, the 1964–67 National Master Freight Agreement. The nature of the negotiations leading up to that agreement and the relationship of individual employers and regional employer associations to the national employer bargaining representatives are set out at some length in the Board's decision and order, 172 N.L.R.B. No. 40. We do not repeat that discussion here.

The chronicle of events most pertinent to the charges here involved begins in late 1963. Before January 1, 1964, the Company's Yuma employees were represented by Local 898, affiliated with *Joint Council 42 (Los Angeles)*. Effective January 1, 1964, Teamsters International granted permission to transfer jurisdiction over the Yuma employees from Joint Council 42 to Joint Council 71 (Phoenix). By January 1, 1964, a majority of the Company's Yuma employees had transferred membership to Local 104, affiliated with Joint Council 71. Through February, 1964, the Company recognized and dealt with Local 104 as the representative of its Yuma employees under the terms of the then current 1961–64 Western States Master Freight Agreement.

In January, 1964, the Company discharged two of its Yuma truck drivers and laid off another. Local 104 notified the Company in early February that a grievance had been filed over one of the discharges. The Company then sought advice from the California Trucking Association, a regional employer bargaining association of which the Company was a member, about the jurisdiction of Local 104. A labor relations employee of the Association advised the Company that it need not deal with Local 104 and prepared a document, which the Company executed, cancelling the Company's power of attorney authorizing the Association to bargain for it with Local 898 as representative of the Yuma employees.

On February 17, 1964, representatives of Local 104 were informed by the Company that it did not recognize Local 104 under the existing contract and that it would refuse to participate in any grievance proceedings. Shortly, thereafter, the Local wrote a letter to the Company demanding that it recognize and bargain with it and filed grievances on behalf of two of the terminated truck drivers. After a hearing on March 2, 1964, the Area Joint Labor-Management Committee issued its decision directing the Company to recognize and deal with Local 104 and to reinstate the two drivers. The Company did not comply and on April 23 cancelled its remaining powers of attorney for bargaining with Teamster locals, effective June 30, 1964, the expiration date of the 1961–64 Agreement.

On April 28, 1964, Local 104 went on strike and began picketing at the Company's Los Angeles and Yuma terminals. The Los Angeles picketing continued substantially uninterrupted until late June or early July, 1964, when five of the Los Angeles based strikers, members of Local 208, announced to the Company that the picket line had been withdrawn and unconditionally offered to return to work. The Company refused the offer, stating that the strikers had been permanently replaced on May 28 and that they would have to apply for rehire with a new seniority date. Local 208 then filed grievances on behalf of the replaced strikers with the Area Joint Labor-Management Committee. The Company sent its attorney as its representative to the grievance proceeding. Under a Joint Area Committee rule, however, an attorney is not a proper representative, and he was excluded. The Company failed to substitute a proper representative, and the grievances were processed *ex parte*, resulting in an order depriving the Company of its protection under the contract's no strike clause. The strikers were not ordered reinstated.

At the Yuma terminal, picketing did not cease until May, 1965, when all the

Yuma based strikers, members of Local 104, unconditionally offered to return to work. The Company did not rehire any of the strikers, citing, among other reasons, permanent replacement and strike misconduct. It does not appear that grievances were filed on behalf of any of the Yuma based strikers.

At the Company's Phoenix terminal, there was a short period of picketing from the evening of June 7 until June 10, 1964. Two of the Phoenix strikers, who unconditionally offered to return to work, were discharged. Grievances were filed on their behalf, and the Company again failed to send a proper representative. On June 16, 1964, the grievance committee ordered the strikers reinstated, but the Company refused to comply.

The Company argues that the unfair labor practice charges brought against it are barred by the six-month statute of limitations contained in section 10(b) of the Act.[1] The charges were filed on December, 8, 1964. Thus, the section 10(b) cutoff date is June 8, 1964.

1. *Section 8(a) (5) and (1) violations.*

■ The Board found that the Company violated sections 8(a) (5) and (1) by

"(1) refusing to recognize or deal with the Teamsters International, Local 104, Local 208, and Local 357, as the collective-bargaining representative of the employees here involved on or after June 8, 1964; (2) repudiating and refusing to abide by the terms and conditions of the applicable 1961–64 collective-bargaining agreements in question on or after June 8, 1964; (3) refusing to process, pursuant to the applicable 1961–64 and 1964–67 bargaining agreements, the grievances filed in behalf of certain discharged and/or laid-off employees after June 8, 1964; (4) refusing to abide by the awards made by the duly constituted grievance panels with re-

spect to the aforesaid grievants; (5) refusing to recognize and repudiating the applicable 1964–67 collective-bargaining agreements here in question; and (6) refusing to recognize on and after June 8, 1964, the transfer of jurisdiction from Joint Council 42 to Joint Council 71."

In making these findings the Board modified the Trial Examiner's recommendation by recognizing as violations only conduct occurring after June 8, 1964. Specifically, the Board relied on (a) the Company's failure to process the June 16, 1964, grievances of the discharged Phoenix strikers, (b) the failure to process the late June or early July, 1964, grievances of the Los Angeles strikers, and (c) a November 7, 1964, strike settlement meeting during which the Company repudiated its obligation to execute and abide by the 1964–67 Agreement. The Board now concedes that finding (c) above is not supported by substantial evidence because the Trial Examiner expressly discredited the testimony on which it was based. That leaves only the failure to process the two grievances as conduct occurring after the 10(b) cutoff date. We conclude that that conduct, standing alone, does not constitute substantial evidence of a refusal to bargain in good faith in violation of sections 8(a) (5) and (1).

■ We begin with the proposition that Congress did not intend every breach of a collective bargaining agreement to be, *per se,* an unfair labor practice. See International Union, United Mine Workers v. N.L.R.B., 1958, 103 U.S.App.D.C. 207, 257 F.2d 211, 214–215 (discussing the legislative history of the Taft-Hartley Act). See also Amalgamated Clothing Workers of America v. N.L.R.B., 1965, 120 U.S.App.D.C. 47, 343 F.2d 329, 331; Cheney California Lumber Co. v. N.L.R.B., 9 Cir., 1963, 319 F.2d 375, 378. Of course, some breaches of contract may also amount to unfair

1. Section 10(b) provides in pertinent part:
" * * * [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *." 29 U.S.C. § 160(b).

labor practices. See N.L.R.B. v. C & C Plywood Corp., 1967, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486.

 The question to be determined in each case is whether under the circumstances conduct which arguably is a breach of the terms of a collective bargaining agreement also violates the statutory obligation to bargain in good faith as defined in section 8(d) of the Act.[2] In making such a determination it must be kept in mind that Congress provided a judicial remedy for enforcement of labor contracts when it enacted section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and that the remedy is available even though the conduct constituting a breach; of contract is also an unfair labor practice. See Smith v. Evening News Association, 1962, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246. The section 301 remedy extends to suits to compel arbitration of individual grievances, Textile Workers v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, and to specifically enforce an arbitrator's award ordering reinstatement and back pay to individual employees, United Steelworkers v. Enterprise Wheel and Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. The availability of the alternative remedy under section 301 argues for restraint by the Board in equating a failure to follow the contractual grievance procedure with a refusal to bargain. Cf. Amalgamated Clothing Workers of America v. N.L.R.B., *supra*, 343 F.2d at 333.

In this case the Board found that the Company failed to process the Phoenix and Los Angeles grievances. The Board's characterization is misleading. Under the contract, the grievance machinery is self-processing. A failure on the part of the non-complaining party to appear and participate does not halt or substantially delay the grievance process. Thus, here, despite the Company's failure to send a proper representative, the grievances proceeded to a final determination resulting in awards against the Company. The Los Angeles grievance award was only a self-executing forfeiture of the Company's no-strike-clause protection. The Phoenix award ordered reinstatement, but the appropriate remedy there is a section 301 suit to enforce the award. See Truck Drivers Union v. Riss & Co., 1963, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918. Under these circumstances, the Company's failure to participate in the grievances and to abide by the Phoenix award, without more, does not amount to substantial evidence that the Company refused to bargain collectively in good faith.

 The Board argues, however, that there is more. Recalling the Company's withdrawal of recognition of the locals involved, its refusal to bargain with them on request, its repudiation of the existing contracts and its stated intention not to participate in grievances, all occurring before June 8, 1964, the Board says that the Company engaged in a continuing refusal to bargain which began before the section 10(b) cutoff date and extended beyond it. The Company's failure to participate in grievances and abide by awards after the 10(b) cutoff date, the argument continues, when viewed in the context of the Company's earlier conduct, are acts in furtherance of the continuing refusal to bargain.

We think the Board's argument is precluded by section 10(b) as construed by the Supreme Court in Local Lodge No. 1424, I.A.M. v. N.L.R.B., 1960, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832.

2. Section 8(d) defines the duty to bargain collectively as " * * * the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." 29 U.S.C. § 158(d).

There the Board argued that continued enforcement within the six month period of a union security clause that was invalid because of the union's lack of majority status at the time of the execution of the contract was an independent unfair labor practice. The Court held, however, that the charge filed more than six months after the execution of the contract, was time-barred. The Court stated:

> "[I]n applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely 'evidentiary,' since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice." 362 U.S. at 416–417, 80 S. Ct. at 826–827.

We think that the situation involved here is of the second type. The Board concedes that unfair labor practice charges based upon the Company's pre-cutoff-date conduct are time-barred. The post-cutoff-date conduct, as we have held above, is not in and of itself an unlawful refusal to bargain, but, at most, a breach of contract. Under the Board's theory of a continuing refusal to bargain, it is only by reliance on the Company's time-barred conduct as being a refusal to bargain that the Board is able to draw the inference that the later conduct continued the refusal into the six month period. The use of the earlier conduct is not merely "evidentiary." It serves to change conduct which, in its absence, is not an unfair labor practice, into conduct which is. This the Board may not do. To put it another way, the Board's approach necessarily required it to litigate whether the Company's time-barred acts amounted to a refusal to bargain. If they did not, the later events could not have been a continuation. But to permit litigation as to the legal significance under the Act of those past events would be directly contrary to the policies[3] underlying section 10(b) and amount to the revival of legally defunct unfair labor practices. The absence of a Board "finding" that the Company's pre-cutoff-date conduct was a refusal to bargain is not significant where it is manifest that were that not the case the later conduct could not be deemed a refusal to bargain. See Local Lodge No. 1424, *supra* at 425, 80 S.Ct. 822.

█ In summary, if there was a refusal to bargain here, it occurred more than six months before the filing of the unfair labor practice charges. To avoid the time bar the local unions involved would have had to renew their request for recognition and bargaining within the six month period.[4] There is no

---

3. "The policies are to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused,' H.R.Rep.No.245, 80th Cong., 1st Sess., p. 40, and of course to stabilize existing bargaining relationships." Local Lodge 1424, supra, 362 U.S. 419, 80 S.Ct. 828.

4. International Union United Automobile, etc. v. N.L.R.B., 1966, 124 U.S.App.D.C. 215, 363 F.2d 702, cited by the Board is distinguishable. There the company had

Board finding that they did. The Board did find, however, that the Company violated sections 8(a) (5) and (1) by failing to execute the 1964–67 National Master Freight Agreement negotiated on its behalf by the national multiemployer bargaining representatives. But the Board has now conceded that the November 7 meeting on which it relied to establish a failure to execute the Agreement cannot fairly be cited for that purpose. The Trial Examiner found that Local 208 requested the Company on April 27, 1964 to sign the new Agreement by no later than July 1, 1964. Arguably, the Company's failure so to sign by that date was a refusal to bargain within the six month period. However, the Board, for its own reasons, right or wrong, chose not to rely on that request to sign. It would not be appropriate for this court to supplant the Board's judgment on this matter, especially when the Board does not urge us to do so.

2. *Section 8(a) (3) violations.*

■ The Board found that the Company committed unfair labor practices by refusing to reinstate certain unfair labor practice strikers and ordered the Company to reinstate those strikers who had not been permanently replaced before June 8, 1964, and had unconditionally offered to return to work after that date. A refusal to reinstate unfair labor practice strikers is a violation of section 8(a) (3) of the Act. See Mastro Plastics Corp. v. N.L.R.B., 1956, 350 U. S. 270, 76 S.Ct. 349, 100 L.Ed. 309.

The question presented is when, if ever, the strike became an unfair labor practice strike. The Board, relying on its decision in Greenville Cotton Oil Co., 1950, 92 N.L.R.B. 1033, enforced, 5 Cir., 1952, 197 F.2d 326, takes the position that section 10(b) precludes the use of the Company's pre-cutoff-date conduct as a basis for finding that the strike was an unfair labor practice strike at its inception. Nevertheless, the Board found that the Company's continued refusal to bargain after the cutoff date prolonged the strike and converted it into an unfair labor practice strike as of June 8, 1964. Because we have held above that there is not substantial evidence to support the Board's finding of a refusal to bargain after June 8, 1964, it necessarily follows that the Board's finding that the strike became an unfair labor practice strike after June 8 is also in error.

■ On this issue it may well be that the Board has taken a more restrictive position than the law requires. The *Greenville* decision has been expressly rejected by the Courts of Appeals for the Sixth and Eighth Circuits. See Philip Carey Mfg. Co. v. N.L.R.B., 6 Cir.,

refused the union's demand for recognition and bargaining made more than six months prior to the filing of the unfair labor practice charges. The court held that a new union demand within the six-month period was unnecessary to make out a continuing refusal to bargain where such a demand would have been useless given the company's prior peremptory refusal. The court, however, carefully pointed out that "[t]his was not a case of mere Company inaction for six months following a refusal to bargain. The continuing nature of the Company's refusal in this case is clear from the Board's findings that the Company's determination to refuse to recognize and bargain was actively implemented in the months following its letter by its efforts to undermine the Union." 363 F.2d at 706. The efforts referred to included interrogating employees as to their union sympathies, spying on organizational meetings, threatening a plant closure, and discharging several employees who were active in the union campaign—all unfair labor practices in violation of sections 8(a) (1) and (3) within the six-month period. The court thought that the Board was justified in treating this later conduct as "reiterations by deed of the underlying refusal to bargain." 363 F.2d at 707. In this case, however, the Company's post-cutoff-date conduct cannot be so treated. As we have mentioned, the failure to participate in grievances, standing alone, is not a violation of the Act, but, at most, passive inaction amounting to a breach of contract. We think it would be improper to equate such conduct with active efforts to undermine the union in order to make out a continuing refusal to bargain.

1964, 331 F.2d 720, 732; N.L.R.B. v. Brown & Root, Inc., 8 Cir., 1953, 203 F. 2d 139, 146. Those circuits have held that the six month period begins to run from the date reinstatement was denied and that evidence of an earlier unfair labor practice may be used for the limited purpose of determining whether the strikers were unfair labor practice strikers and thus entitled to reinstatement even though permanently replaced. The latter position has much to recommend it because it eliminates the possibility that strikers returning after an unfair labor practice strike of greater than six months duration might never be entitled to reinstatement. Whether this approach can be reconciled with Local Lodge No. 1424, *supra*, is a question we need not decide. The Board chose to decide the case on a narrow ground which is not supported by substantial evidence. We are not urged to adopt a broader ground than the Board chose, and we will not do so on our own initiative.

The Board's order is denied enforcement and is set aside in its entirety.