**NEW YORK DISTRICT COUNCIL NO. 9, INTERNATIONAL BROTHERHOOD OF PAINTERS & ALLIED TRADES, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Association of Master Painters and Decorators of the City of New York, Inc., Intervenor.**

Nos. 228, 229, Dockets 71–1272, 71–1560.

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1971.

Decided Dec. 27, 1971.

15. Ferrell v. Dallas Independent School District, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125. (Douglas, J., dissenting).

**784**

Henry J. Easton, New York City (Easton & Echtman, New York City), for petitioner.

Eugene B. Granof, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frank Vogl, Atty., N. L. R. B.), for respondent.

Fred P. Ellison, New York City (French, Fink, Markle & McCallion, New York City), for intervenor.

Before MOORE, HAYS, and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

New York District Council Number 9 of the International Brotherhood of Painters and Allied Trades, AFL–CIO (Union) petitions this court to review an order of the NLRB;[1] the Board cross-petitions for enforcement.[2] The Board's order provides, in relevant part, that the Union cease and desist from enforcing, unilaterally and without notice to or consultation with the charging parties herein,[3] any production

quota against employees of the charging parties performing work on New York City Housing Authority projects.[4] The order also requires the Union to, on request, bargain collectively in good faith with the charging parties prior to enforcement of any production quota.[5] We deny the Union's petition to review; we grant the Board's petition for enforcement.

I.

On March 5, 1968, the Union unanimously adopted at a special meeting a resolution, effective April 1, 1968, stipulating that no journeyman member employed on New York City Housing Repaint work paint more than 10 rooms per week. According to the Union, the purpose of the rule is to relieve the pressure on painters to work quickly so as to reduce the number of violations of trade rules, increase the health and safety of union members, and improve the quality of their work. The Union sought to enforce the rule by requiring members to carry cards setting forth the rule and the penalties for violation, and by instructing Union stewards to submit daily reports on production.

Prior to the announcement of this resolution, journeymen painted on average 11.5 rooms per week. The then existing collective bargaining contract made no reference to production quotas, but it did provide that Union members would work a seven-hour day, five-day work week.

1. Pursuant to section 10(f) of the National Labor Relations Act (Act), 29 U.S.C. § 160(f) (1970). The trade agreement between the parties terminated on July 31, 1971. We do not know whether a new agreement has been negotiated, or whether the new agreement, if any, contains a provision dealing with production quotas. However, in view of the continuing character of the obligation imposed by the Board's order, we will examine the merits regardless of whether the case is moot. See J. I. Case Co. v. NLRB, 321 U.S. 332, 334, 64 S.Ct. 576, 88 L.Ed. 762 (1944).

2. Pursuant to section 10(e) of the Act, 29 U.S.C. § 160(e) (1970).

3. The eight charging parties are painting and decorating contractors. Five of the eight belong to the Association of Master Painters and Decorators of the City of New York, Inc. (Association), which represents its members in bargaining with the Union. The historical bargaining practice has been for the Union and the Association to negotiate a contract and, thereafter, for the independents to enter into substantially identical agreements with the Union.

4. Painters District Council (Westgate Painting & Decorating Corp.), 186 N.L. R.B. No. 140, 75 L.R.R.M. 1465, 1467 (1970).

5. *Id.*

On March 13, after receiving protests from members about the 10-room rule, Louis Elkins, secretary of the Association, informed the Union that the rule was contrary to a long-established trade principle, and that it violated Article XXII of the existing trade agreement, which provided that neither party to the agreement shall make any rule conflicting with the terms of the agreement. Elkins requested that the Union rescind the rule or refrain from taking action to implement it.

In reply Frank Schonfeld, the Union's secretary-treasurer, contended that the rule did not violate any term of the agreement, and therefore refused to accede to Elkins' request. Schonfeld similarly rejected a later request by Elkins that the matter be submitted to the Joint Trade Board [6] for resolution and submission to arbitration if necessary. While Elkins threatened court action, no such action was taken, apparently in the belief that the issue would be settled in the forthcoming negotiations on the new trade agreement.

Negotiations relating to a new agreement commenced in June of 1968. On July 31, the date on which the existing agreement expired, the Union called a strike, which was to last until September 9, the date on which the new contract was executed. During negotiations both sides submitted demands with respect to production quotas.[7] The Association abandoned its demand early in the negotiations, but consistently refused to accept the Union's demand. Unable to reach an accord on this issue, the parties signed the new agreement adhering to the positions they held prior to negotiations—the Association believing that the rule violated the terms of the agreement, the Union believing that the rule did not and that it was a proper means of internal union management.

As did the old agreement, the new agreement provided for a seven-hour day, five-day work week, with journeymen to be paid by the hour.

After the strike ended, the Union intensified its efforts to enforce the 10-room rule. It threatened to fine those members who did not comply with the rule. Some members, at Union urging, stopped work after painting 10 rooms even though they had not yet worked the full 35 hour week. As a result of the Union's efforts, average production fell below the 11.5 room average.

In response, some employers discharged painters who reduced their output in observance of the rule, or docked employees for time not worked when they left the job after having met the 10-room quota.

Finally, on December 27, 1968, the five Association members and several independents filed section 8(b) (3) charges against the Union with the Board. After extensive hearings, the Trial Examiner recommended dismissal of the complaint as time-barred. The Board, one member dissenting, disregarded this recommendation, holding that the complaint was not time-barred, and that the Union had committed an unfair labor practice.[8]

## II.   *The Effect of the 10-Room Rule*

It is important to the resolution of the legal issues in this case to understand

---

6. A board established by the trade agreement between the Union and the Association to hear complaints against either based on violations of the agreement. The board is composed of three members from each party to the agreement.

7. The Union demand was that "[t]he Union shall have the right to establish a maximum standard of production." The Association demand was a proposal to amend Article XXII to read "[d]uring the life of this Trade Agreement neither party to it shall promulgate any rules establishing a standard of production, or continue in force, or make any rules or by-laws conflicting with its provisions." Because the Union demand was not limited to New York Housing Authority Re-paint work, it was broader than the 10-room rule.

8. *See* Painters District Council (Westgate Painting & Decorating Corp.), 186 N.L. R.B. No. 140, 75 L.R.R.M. 1465 (1970).

the effect of the 10-room rule. First, under the trade agreement between the Association and the Union, journeymen painters are required to work five seven-hour days a week. Second, prior to the announcement of the 10-room rule, journeymen painted on average 11.5 rooms per week. Moreover, the evidence reviewed above gives rise to the inference that but for the Union's enforcement of the 10-room rule, journeymen painters would continue to paint on average at least more than 10 rooms per week. It is thus apparent that effective enforcement of the 10-room rule would permit those painters who can paint more than 10 rooms per week to work less than 35 hours a week.

### III. Whether This Complaint Is Time-Barred

The Union first announced the 10-room rule in March of 1968; the charges giving rise to this complaint were filed in December of 1968, more than six months later. Petitioner thus contends that the complaint is time-barred by section 10(b) of the Act.[9] We disagree.

■ The substance of the unfair labor practice charged against the Union is that it promulgated and sought to enforce a rule that violates the terms of the collective bargaining agreement between the parties. The 10-room rule is "unfair" only by reference to the terms of the collective bargaining agreement with which it allegedly conflicts. Thus, regardless of whether the announcement of the 10-room rule in March of 1968 constituted an unfair labor practice under the old collective bargaining agreement, a distinct violation occurred in September of 1968 if the 10-room rule conflicts with the terms of the new collective bargaining agreement.[10] In short, even had the parties "agreed" under the old agreement that journeymen would paint 10 and only 10 rooms per week, if the terms of the new agreement are inconsistent with the 10-room rule, then by enforcing the rule the Union committed an unfair labor practice in September of 1968. If the Union committed a distinct unfair labor practice in September, then the complaint is not time-barred.

### IV. Whether Enforcement of the 10-Room Rule Constitutes An Unfair Labor Practice

Section 8(b) (3) of the Act provides that it is an unfair labor practice for a labor organization to refuse to bargain collectively with an employer.[11] Section 8(d), in defining the nature of the collective bargaining obligation, provides that:

. . . where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof . . . ;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty

---

9. " . . . no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . ." Act § 10(b), 29 U.S.C. § 160(b) (1970).

10. See Local Lodge No. 1424, International Assn. of Machinists' (Bryan Mfg. Co.) v. NLRB, 362 U.S. 411, 416–417, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960); Cone Mills Corp. v. NLRB, 413 F.2d 445, 448–449 (4th Cir. 1969); International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO v. NLRB, 124 U.S.App.D.C. 215, 363 F.2d 702, 706–707 cert. denied, 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1966).

11. Act § 8(b) (3), 29 U.S.C. § 158(b) (3) (1970).

days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later . . . .[12]

■ In our opinion the Union's enforcement of the 10-room rule violates the term of the September 9th collective bargaining agreement that stipulates that the standard work week for journeymen painters shall consist of five seven-hour days.[13] By enforcing the rule the Union is in substance modifying this term to stipulate that journeymen are not to work a five day, seven-hour per day work week, but are to work only so long as it takes them to paint 10 rooms. We therefore agree with the Board that before the Union can enforce this mod-

ification of the collective bargaining agreement, it must bargain collectively with the Association over the issue. This obligation includes, of course, compliance with the four clauses of section 8(d).

The dissenting board member and the petitioner place heavy reliance upon Scofield v. NLRB [14] in support of their position. We believe that this reliance is misplaced. Scofield involved charges by union members that fines imposed by their union for violation of a production quota violated their section 7 rights and therefore constituted an unfair labor practice. In holding that the imposition of the fines as a means of enforcing the production quota did not constitute an unfair labor practice, the Court was careful to point out that the imposition of the fines in no way violated the terms of the collective bargaining agreement.[15] In Scofield the production quota was at a level *above* the production level of the average efficient worker.

■ We are aware that the National Labor Relations Act does not grant to the Board or to the courts the power to impose substantive contract terms upon the parties to a collective bargaining agreement.[16] But the Board and the

12. *Id.* § 8(d), § 158(d).

13. *See* Associated Home Builders of the Greater East Bay, Inc. v. NLRB, 352 F.2d 745 (9th Cir. 1965). In *Associated* an association of builders claimed that a union's imposition of fines upon its members for exceeding a unilaterally imposed production quota violated the union members' section 7 rights and was therefore a section 8(b) (1) (A) unfair labor practice. The production quota imposed was at a level lower than the average production of the union members. The court found it unnecessary to decide this issue because it considered that the union's action probably constituted a section 8(b) (3) violation. It therefore remanded the case to the Board for further findings on the 8(b) (3) issue. On remand the Board adopted the Trial Examiner's finding that the 8(b) (3) issue was moot because the parties had subsequently executed a collective bargaining agreement that prohibited the imposition of production quotas.

14. 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed. 2d 385 (1969).

15. "Nor does the union ceiling itself or compliance with it by union members violate the collective contract. The company and the union have agreed to an incentive pay scale, but they have also established a guaranteed minimum or machine rate considerably below the union ceiling and defined in the contract as the rate of production of an average, efficient worker. The contract therefore leaves in the hands of the employee the option of taking full advantage of his allowances, performing only as an average employee and not reaching even the ceiling rate." 394 U.S. at 433, 89 S.Ct. at 1160.

16. H. K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); Burns International Detective Agency, Inc. v. NLRB, 441 F.2d 911, 915–916 (2d Cir. 1971), cert. granted, 404 U.S. 822, 92 S.Ct. 99, 30 L.Ed.2d 49 (1971).

courts clearly have the power pursuant to section 8(d) to compel the parties to a collective bargaining agreement to abide by the terms of their agreement, and to amend those terms only through the process of collective bargaining.[17] If the Union wishes to define the work week of its members in terms of their output rather than in terms of hours, then it can insist on such a provision through the process of collective bargaining.

The petition for review is denied; the cross-petition for enforcement is granted.

HAYS, Circuit Judge (dissenting):

I dissent on the ground (1) that the rule promulgated by the union constituted no violation of the collective agreement, (2) that, assuming arguendo that the rule *did* violate the collective agreement, the remedy, a finding that the action of the union constituted an unfair labor practice, is an inappropriate remedy for such a violation, (3) that, if the majority were right in holding that the union's rule violates a provision of the collective agreement (or, indeed, even if the majority is wrong, since the subject was admittedly discussed during nego-

tiations, see National Labor Relations Board v. Jacobs Manufacturing Company, 196 F.2d 680 (2d Cir. 1952)), the Board's order to the union to bargain, involving as it does a corresponding duty on the part of the employer, would be in violation of the terms of Section 8(d). It also seems to me that the majority has incorrectly applied the rule set forth in Local Lodge No. 1424, International Association of Machinists v. NLRB [Bryan Mfg. Co.], 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) and that the complaint was barred by the six-month statute of limitations of § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b) (1970).

What the majority actually holds, in effect, is that the union's conduct in promulgating and seeking to enforce its work limitation rule violated the provisions of the collective agreement, specifically the provision stipulating a five day, seven-hour per day work week. However the ordinary and usual wages and hours provisions contained in a collective agreement cannot be magically transformed into provisions specifying the rate of speed at which employees are to work or the amount they are to produce. There was no provision whatever in the

17. We agree with the dissent that it is not a part of the Board's function to police the enforcement of collective agreements. But as the Court said in *C & C Plywood*:
. . . in this case the Board has not construed a labor agreement to determine the extent of the contractual rights which were given the union by the employer. It has not imposed its own view of what the terms and conditions of the labor agreement should be. It has done no more than merely enforce a statutory right which Congress considered necessary to allow labor and management to get on with the process of reaching fair terms and conditions of employment—"to provide a means by which agreement may be reached." The Board's interpretation went only so far as was necessary to determine that the union *did not agree to give up these* statutory safeguards. Thus, the Board, in necessarily construing a labor agreement to decide this unfair labor practice case, has not exceeded the jurisdiction laid out for it by Congress.

NLRB v. C & C Plywood Corp., 385 U.S. 421, 428, 87 S.Ct. 559, 564, 17 L.Ed.2d 486 (1967). In *C & C Plywood* the Court held that the NLRB did have jurisdiction to issue a cease and desist order to an employer who neither by custom nor by the terms of the collective bargaining agreement had the power to unilaterally change the wage system. *See* NLRB v. Strong, 393 U.S. 357, 360–361, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 30, 30 n. 7, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *id.* at 37, 87 S.Ct. 1792 (dissenting opinion of Justice Harlan); Smith v. Evening News Ass'n, 371 U.S. 195, 197–198, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); United Aircraft Corp. v. Canel Lodge No. 700, International Assn. of Machinists' and Aerospace Workers, AFL–CIO, 436 F.2d 1, 3–4 (2d Cir. 1970), cert. denied, 402 U.S. 908, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); NLRB v. M & M Oldsmobile, Inc., 377 F.2d 712, 715–716 (2d Cir. 1967).

agreement requiring the union members to paint 11.5, or for that matter any particular number, of rooms per week. Under Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), the union could properly adopt and enforce on its members a rule such as the one here involved. Since the employer had no right under the collective agreement to demand that employees paint any specific number of rooms per day, the union retained the power to act unilaterally with respect to that issue. The employers' recourse was either to discharge those painters who did not paint the number of rooms per day the employer considered satisfactory, or to secure from the union an agreement not to promulgate a work limitation rule.

But, assuming arguendo, that the union did violate the collective agreement by the promulgation and enforcement of its rule, the Board's finding that this violation constituted an unfair labor practice is wholly unjustified. It is not a part of the Board's function to police the enforcement of collective agreements. See NLRB v. C & C Plywood Co., 385 U.S. 421, 427–428, 87 S.Ct. 559, 17 L.Ed. 2d 486 (1967); Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 510–511, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). If the union violated the agreement, it would subject itself to an action for breach of contract under Section 301 of the Act, 29 U.S.C. § 185. The Board cannot take over enforcement of collective agreements by the device of holding that any violation constitutes a unilateral change in the agreement and therefore the unfair labor practice of refusal to bargain.

Moreover if the union's adoption of the work-limitation rule amounted to a change in the terms and conditions of employment, the Board is prevented by Section 8(d), 29 U.S.C. § 158(d) (1970) from ordering the parties to bargain about it. Section 8(d) provides that the duty to bargain collectively "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such mod-ification is to become effective before such terms and conditions can be reopened under the provisions of the contract." The Board's order requiring the union and, therefore, the employer, to bargain is inconsistent with the determination that the promulgation of the rule changed a term or condition of employment contained in the collective bargaining agreement. The Board, in effect, holds that the union has refused to bargain concerning a term over which the union and the employer have already bargained and which they have included in the contract, and about which, under § 8(d), they not only have no duty to bargain further but they have no *right* to bargain. This inconsistency is itself sufficient ground for denying the Board's cross-petition for enforcement.

In addition I would hold the complaint barred by the six-month statute of limitations provision of Section 10(b).

The union promulgated the work limitation rule on March 5, 1968. Charges that the rule violated § 8(b) (3) were not filed until December 27, 1968, almost eight months after promulgation. The only conduct alleged to violate § 8 (b) (3) that occurred during the six-month period preceding the filing of charges was the alleged union effort to *enforce* the previously adopted rule. *Bryan* established that charges can be filed and a complaint issued against such enforcement efforts as those involved in the instant case only if charges could still be filed against the act of adopting the rule being enforced. The Court in *Bryan* rejected the Board's argument that the *enforcement* of a union security clause within the statutory period could be the basis of a timely complaint, even though the original *execution* of the agreement containing the clause occurred more than six months prior to the filing of charges. 362 U.S. at 415, 80 S. Ct. 822. The Court pointed out that "the Board's position would mean that the statute of limitations would never run in a case of this kind." *Id.* at 416, 80 S. Ct. at 826. In the instant case, the work limitation rule was "perfectly lawful on

the face of things," and was held to be unlawful only on the ground that it was said to conflict with a provision of the original and of the second agreement. To paraphrase the Supreme Court's language in *Bryan*, if an unfair labor practice can be established only by reference to the promulgation of the rule, a time-barred event, the policies underlying § 10(b) would be vitiated by allowing a complaint to be issued against the union's attempt to enforce that rule. *Id.* at 419, 80 S.Ct. 822. The union's effort to enforce the work limitation rule is "a *suable* unfair labor practice only for six months following the" promulgation of the rule. *Id.* at 423, 80 S.Ct. at 830.

The majority reasons that, "regardless of whether the announcement of the 10-room rule in March of 1968 constituted an unfair labor practice under the old collective bargaining agreement, a distinct violation occurred in September of 1968 if the 10-room rule conflicts with the terms of the new collective bargaining agreement." However where the enforcement of a rule is involved *Bryan* rejected the "continuing violation" theory. The majority's reliance on the "distinct act" cases is misplaced. In those cases the acts constituting unfair labor practices were qualitatively different, NLRB v. Local 210, International Brotherhood of Teamsters, 330 F.2d 46 (2d Cir. 1964), or were repeated instances of specific acts which in and of themselves constituted unfair labor practices, *compare* NLRB v. Electric Furnace Co., 327 F.2d 373, 376 (6th Cir. 1964), and American Federation of Grain Millers v. NLRB, 197 F.2d 451 (5th Cir. 1952) *with* Cone Mills Corp. v. NLRB, 413 F.2d 445, 448 (4th Cir. 1969); Melville Confections, Inc. v. NLRB, 327 F.2d 689 (7th Cir.), cert. denied, 377 U.S. 933, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964); NLRB v. White Const. & Eng'r Co., 204 F.2d 950 (5th Cir. 1953); International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO v. NLRB, 124 U.S.App.D.C. 215, 363 F.2d 702, cert. denied, 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1966). In *Bryan* the Court explicitly rejected

the contention that the execution of a new agreement and the attempt to enforce a previously promulgated rule constituted a new unfair labor practice for purposes of § 10(b).

"It is apparently not disputed that the Board's position would withdraw virtually all limitations protection from collective bargaining agreements attacked on the ground asserted here. For, once the principle on which the decision below rests is accepted, so long as the contract—*or any renewal thereof*—is still in effect, the six-month period does not even begin to run."

362 U.S. at 425, 80 S.Ct. at 831 (emphasis added). See NLRB v. Lundy Mfg. Corp., 286 F.2d 424 (2d Cir. 1960).

For these reasons it appears that neither the promulgation nor the enforcement of the union's work limitation rule violated § 8(b) (3). I would grant the application to set aside the order of the Board and deny the cross-petition for enforcement.